# SUMMARY APPRAISAL REPORT

## INDUSTRIAL BUILDING

8190 Murray Avenue
Gilroy, California

| | |
|---|---|
| VALUATION DATE: | October 7, 2009 |
| APPRAISED FOR: | Vestin Mortgage, Inc |
| APPRAISED BY: | Guido M. Villanueva<br>6625 Amber Lane<br>Pleasanton, CA 94566 |
| OUR FILE NUMBER: | 2009-045 EB S |

EXHIBIT " _B_ "

# VILLANUEVA REALTY ADVISORS

October 30, 2009

Mr. Daniel B. Stubbs
Senior Vice President – Underwriting
Vestin Mortgage, Inc.
6149 S. Rainbow Boulevard
Las Vegas, Nevada 89118


Re:     Appraisal of Industrial Building
        Located at 8190 Murray Avenue
        Gilroy, California;
        APN:  841-59-022

Dear Mr. Stubbs:

At your request, we have prepared an updated appraisal report of the industrial building located at 8190 Murray Avenue Gilroy, California 95020.  The subject is further identified as Santa Clara County's Assessor Parcel Number 841-59-022.  The property was previously appraised under job number 1008-040 with a date of value of October 7, 2008.

The improvements consist of three buildings.  Building A is a dilapidated one-story building constructed in 1967. This building contains 25,048 square feet of manufacturing space with no office build out and has water damage which has not been repaired.  This building is currently unusable in its current condition.  According to the owners, plans call for the renovation of this building for additional commercial linen services.   A cost estimate of $650,000 was reported in March 2008 by the owner to repair the roof and covert the west wall of this building to include a roll up loading dock.  No recent cost estimate has been provided.

Buildings B and C are one and two story, concrete block industrial buildings which were built in 1991. Building B has 87,557 square feet and Building C has 14,909 square feet. Together, these two buildings comprise an aggregate 102,466 square feet of gross and net rentable building area. The interior is finished as approximately 18% finished office areas, along with restrooms. The remaining area is open manufacturing space which is used as a commercial laundry facility.  The improvements are in average condition with various items of deferred maintenance.

In aggregate, the subject's three buildings contain a total 127,514 square feet.  The existing build-out is approximately 18% finished open office area with the remaining open warehouse/manufacturing space.  The subject was formerly 100% occupied by West Coast Linen and used as a commercial laundry facility.  As of November 2008, the facility was closed down and the property is currently 100% vacant as of the date of value.

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 2 of 89

Mr. Stubbs
Vestin Mortgage, Inc.
October 30, 2009


There are 174 on site parking spaces.  Based on the gross and net rentable building area of 127,514, a parking ratio of 1.36 spaces per 1,000 square feet of building area is indicated.

The purpose of this appraisal is to estimate the "as is" market value of the subject property.  For the purposes of this appraisal, we will provide two valuations, a "Stabilized upon Completion" and an "As Is" market value estimate.  The scope of the appraisal includes the fee simple market value of the property.  The property is appraised free and clear of liens and encumbrances, such as mortgages and/or assessments outstanding.  Our valuation date is October 7, 2009, which coincides with our inspection of the property.  The function of the appraisal is to estimate market value for loan underwriting purposes.

This appraisal is limited by three extraordinary assumptions.  The extraordinary assumptions considered in this report are:

1) A preliminary title report was not provided to the appraiser. It is assumed that only typical right-of-way, ingress and egress and utility easements are recorded against the properties, and that no other easements may exist that adversely impacts the subject site;

2) The improvements are currently 100% vacant and available for use as a laundry facility. However, our discussions with various market participants reveal that demand for a laundry facility at this location is limited.  Since the interior improvements including the water tanks, and the laundry wash and dry equipment as well as conveyer systems are all attached to the property and can be sold off at auction, we will assume the building as vacant and available as an industrial manufacturing or warehousing building;

3) and lastly, as noted above, Building A is currently is in poor condition due to water damage and collapsing roof which would require significant redevelopment.  Despite our request, no new cost estimate was provided for our perusal.  According to a cost estimate provided by the owner in March 2008, a cost estimate of $650,000 or approximately $25.95 per square foot has been submitted as a cost to repair the roof and convert the western wall to a roll up loading dock.  Per agreement and discussion with the client, we have relied on the former owner's representation of the cost estimate and have considered the amount to be a reasonable estimate of cost to cure as of our date of value.  Additionally, as reported by the receiver and noted during our inspection of the property, Building B has had significant water damage to the interior due to leaking roofs.  A cost estimate for a roof repair has not been commissioned but the receiver has estimated approximately $100,000 for roof repairs.  Based on Marshall Valuation, coupled with our discussions with Norm Barnes of Barnes Construction, a reasonable estimate of roof repair and patching is approximately $1.00 per square foot.  Based on 87,557 square feet in Building B, a cost estimate of approximately $90,000 is deemed reasonable to repair the leaking roofs.

Based on the above, an aggregate cost to cure estimate of $740,000 will be considered to bring the subject to average condition.

Mr. Stubbs
Vestin Mortgage, Inc.
October 30, 2009

This appraisal report has been prepared at the request of and for the sole use of the client to whom it is addressed. The development of this appraisal is in accordance with Uniform Standards of Professional Practice (USPAP), Standard Rule 1. The report format is that of a "summary" appraisal as outlined in USPAP Standards Rule 2-2(b). The appraisal is made in compliance with the requirements the Uniform Standards of Professional Practice (USPAP), and the Appraisal Institute, as we understand them.

In addition to adequate access to utilities on the property, the city of Gilroy has indicated that the subject property currently has a sewer allocation of 157,117 gallons per day and water at 203,567 gallons per day. If purchased at today's rates (Sewer Development Impact Fee of $3,608 per hundred gallons per day and Water Impact Fee of $5,431 per thousand gallons per day), the required allocation to operate the subject property would cost $6,774,354. ***Should the subject property not utilize its fully allocations for water and sewer, these allocations can be marketable potentially contributing up to $6,774,354 in market value.*** However, the marketability of the sewer allocations and the determination of how much water and sewer will be utilized by the laundry facility are beyond the scope of this appraisal assignment.

Based on our research and analysis, as described in the attached report, it is our opinion that the stabilized upon completion market value of the fee simple interest in the subject property, predicated on an estimate of exposure time of twelve months, as of October 7, 2009, is:

**SIX MILLION THREE HUNDRED THOUSAND DOLLARS**
**($6,300,000)**

Based on our research and analysis, as described in the attached report, it is our opinion that the As Is market value of the fee simple interest in the subject property, predicated on an estimate of exposure time of six months, as of October 7, 2009, is:

**FIVE MILLION FIVE HUNDRED SIXTY THOUSAND DOLLARS**
**($5,560,000)**

Respectfully submitted,

Guido M. Villanueva
Certified-General Appraiser #AG010546
Expires: February 21, 2010
6625 Amber Lane, Pleasanton, CA 94566
Phone: 925-640-7388

## TABLE OF CONTENTS

### Page

Letter of Transmittal ....................................................................................................1
Summary of Salient Facts ............................................................................................5

**SECTION I—INTRODUCTION** ......................................................................**11**
    Valuation Date ....................................................................................... 12
    Purpose Of Appraisal ............................................................................ 12
    Property Rights Appraised .................................................................... 12
    Intended Use And Intended User Of The Appraisal .............................. 13
    Scope Of The Appraisal ....................................................................... 13
    Property Identification ......................................................................... 14
    Assessed Valuation And Taxes ............................................................ 15
    Ownership And Sales History ............................................................... 15
    Competency Statement ........................................................................ 16

**SECTION II—DESCRIPTIVE INFORMATION** .............................................**17**
    Area Analysis ...................................................................................... 18
    City/Neighborhood Overview ............................................................... 25
    Real Estate Market Overview ............................................................... 32
    Site Description .................................................................................... 34
    Zoning ................................................................................................. 37
    Improvement Description ...................................................................... 38
    Americans With Disabilities Act ........................................................... 42
    Highest And Best Use .......................................................................... 42

**SECTION III—VALUATION** ..........................................................................**44**
    The Appraisal Process ......................................................................... 45
    Sales Comparison Approach ................................................................. 45
    Income Approach ................................................................................. 50
    Reconciliation Of Value Indications ...................................................... 57
    Statement Of Stabilized Upon Completion ............................................ 58

    As Is Market Value .............................................................................. 58
    Statement Of As Is Market Value ......................................................... 59

**ADDENDUM**
    Photographs of Subject Property
    Photographs of Building Sales
    Photographs of Rent Comparables
    Qualifications of Guido M. Villanueva
    Assumptions and Limiting Conditions
    Certification of Appraisal

## SUMMARY OF SALIENT FACTS

| | |
|---|---|
| Property Type: | Former Commercial Laundry Facility Manufacturing/Industrial |
| Address: | 8190 Murray Avenue Gilroy, California 95020 |
| Location: | The subject is located on the east side of Murray Avenue in the southwestern portion of the City of Gilroy. |
| Census Tract: | 5126.01 |
| Thomas Brothers Map Page: | 978 A-2 |
| APN: | 841-59-022 |
| Zoning: | CM Commercial Industrial |
| Land Area: | 200,812 square feet, or approximately 4.61 acres |
| Improvements: | The improvements consist of three buildings. Building A is a dilapidated one-story building constructed in 1967. This building contains 25,048 square feet of manufacturing space with no office build out and has water damage which has not been repaired. This building is currently unusable in its current condition. According to the owners, plans call for the renovation of this building for additional commercial linen services. A cost estimate of $650,000 was reported by the owner to repair the roof and covert the west wall of this building to include a roll up loading dock. |
| | Buildings B and C are one and two story, concrete block industrial buildings which were built in 1991. Building B has 87,557 square feet and Building C has 14,909 square feet. Together, these two buildings comprise an aggregate 102,466 square feet of gross and net rentable building area. The interior is finished as approximately 18% finished office areas, along with restrooms. The remaining area is open manufacturing space which is used as a commercial laundry facility. The improvements are in average condition with various items of deferred maintenance |

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 6 of 89

In aggregate, the subject's three buildings contain a total 127,514 square feet. The existing build-out is approximately 18% finished open office area with the remaining open warehouse/manufacturing space.

Extraordinary Utilities:

In addition to adequate access to utilities on the property, the city of Gilroy has indicated that the subject property currently has a sewer allocation of 157,117 gallons per day and water at 203,567 gallons per day. If purchased at today's rates (Sewer Development Impact Fee of $3,608 per hundred gallons per day and Water Impact Fee of $5,431 per thousand gallons per day), the required allocation to operate the subject property would cost $6,774,354.

*Should the subject property not utilize its fully allocations for water and sewer, these allocations can be marketable potentially contributing up to $6,774,354 in market value.* However, the marketability of the sewer allocations and the determination of how much water and sewer will be utilized by the laundry facility are beyond the scope of this appraisal assignment.

Parking:

There are 174 on site parking spaces. Based on the gross and net rentable building area of 127,514, a parking ratio of 1.36 spaces per 1,000 square feet of building area is indicated.

Floor Area Ratio:

63% (127,514 so / 200,812 so)

Flood Zone:

According to FEMA map panel 060340-0002D dated August 17, 1998 the subject property is situated in flood zone "X," an area of minimal flooding. No flood insurance is required.

Earthquake Issues:

Not within an Alquist-Priolo Special Study Zone.

Occupancy:

The subject was formerly 100% occupied by West Coast Linen and used as a commercial laundry facility. As of November 2008, the facility was closed down and is currently 100% vacant as of the date of value.

Highest and Best Use:

As existing manufacturing/ industrial use

Property Rights Appraised:

Fee Simple

Date of Report Preparation:

October 30, 2009

Inspection Date:

October 7, 2009

| | |
|---|---|
| Valuation Date: | October 7, 2009 |
| **Stabilized Market Value Upon Completion:** | **$6,300,000** |
| **As Is Market Value Estimate:** | **$5,560,000** |

Estimated Exposure Period: Our market value estimate is based on an exposure time of 12 months or less. The estimated exposure time is based upon a review of the required marketing time for the comparable sales.

**Extraordinary Assumption**   This appraisal is limited by three extraordinary assumptions. The extraordinary assumptions considered in this report are:

1) A preliminary title report was not provided to the appraiser. It is assumed that only typical right-of-way, ingress and egress, and utility easements are recorded against the properties, and that no other easements may exist that adversely impacts the subject site;

2) The improvements are currently 100% vacant and available for use as a laundry facility. However, our discussions with various market participants reveal that demand for a laundry facility at this location is limited. Since the interior improvements including the water tanks, and the laundry wash and dry equipment as well as conveyer systems are all attached to the property and can be sold off at auction, we will assume the building as vacant and available as an industrial manufacturing or warehousing building;

3) and lastly, as noted above, Building A is currently is in poor condition due to water damage and collapsing roof which would require significant redevelopment. Despite our request, no new cost estimate was provided for our perusal. According to a cost estimate provided by the owner in March 2008, a cost estimate of $650,000 or approximately $25.95 per square foot has been submitted as a cost to repair the roof and convert the western wall to a roll up loading dock. Per agreement and discussion with the client, we have relied on the former owner's representation of the cost estimate and have considered the amount to be a reasonable estimate of cost to cure as of our date of value.

**Extraordinary Assumption (continued)**

Additionally, as reported by the receiver and noted during our inspection of the property, Building B has had significant water damage to the interior due to leaking roofs.  A cost estimate for a roof repair has not been commissioned but the receiver has estimated approximately $100,000 for roof repairs.   Based on Marshall Valuation, coupled with our discussions with Norm Barnes of Barnes Construction, a reasonable estimate of roof repair and patching is approximately $1.00 per square foot.  Based on 87,557 square feet in Building B, a cost estimate of approximately $90,000 is deemed reasonable to repair the leaking roofs. Based on the above, an aggregate cost to cure estimate of $740,000 will be considered to bring the subject to average condition.

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 9
of 89

# SECTION I—INTRODUCTION

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 10 of 89

## VALUATION DATE

The date of this appraisal is October 7, 2009.  This coincides with the date of our last inspection. The date the report was completed and signed is October 30, 2009.

## PURPOSE OF APPRAISAL

The purpose of this appraisal is to estimate the market value of the subject property. "Market Value," as used in this appraisal, is defined as "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."  Implicit in this definition are consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- *Buyer and seller are typically motivated;*

- *Both parties are well informed or well advised, and both acting in what they consider their own best interests;*

- *A reasonable time is allowed for exposure in the open market;*

- *Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

- *The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.*[1]

We have provided a "stabilized upon completion" and an "as is" market value for the subject property.  The "stabilized upon completion" value of the property is the market value under current market conditions prevalent on the date of the appraisal assuming that the roof repair and additional work on the west wall of Building A has been completed.

The "as is" value of the property is the market value in its present condition under market conditions prevalent on the date of the appraisal.  No hypothetical conditions, assumptions, or qualifications concerning the physical or legal aspects of the property are to be observed.

## PROPERTY RIGHTS APPRAISED

The property rights appraised are those of the fee simple interest and the property is appraised free and clear of mortgages and assessments outstanding, but subject to easements, covenants, conditions and restrictions of record.  The fee simple is defined as:  "absolute ownership unencumbered by any other interest or estate; subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."[2]

---

[1]  Uniform Standards of Professional Appraisal Practice, 2001 edition.
[2]  The Dictionary of Real Estate Appraisal, American Institute of Appraisers of the National Association of Realtors,
   Second Edition, Chicago, Illinois:  1989, p.120.

## INTENDED USE AND INTENDED USER OF THE APPRAISAL

The intended user of the report is limited to Vestin Mortgage Inc. and their assigns, for the stated intended use only. It is our understanding that this appraisal will be used for financing and loan underwriting decisions regarding the subject property. This report is not based on a requested valuation, specific valuation or the approval of a loan. The appraisers are not responsible for any unauthorized distribution or use of the report.

## SCOPE OF THE APPRAISAL

The scope of this appraisal is to determine the "as is" market value of the subject property. The report format is that of a summary appraisal. This appraisal was completed in compliance with Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice (USPAP) for a "summary" appraisal report, as promulgated by Standards Board of the Appraisal Foundation. The appraisal is also made in compliance with the requirements of the Appraisal Institute, as we understand them. This "summary" appraisal report is a brief recapitulation of the appraisers' data, analyses and conclusions. Supporting documentation is retained in the appraisers' file.

In preparation of this appraisal report, we inspected the subject property and surrounding neighborhood. An interior and exterior inspection of the property was conducted by Guido M. Villanueva, on October 7, 2009.

This appraisal is limited by three extraordinary assumptions. The extraordinary assumptions considered in this report are:

1) A preliminary title report was not provided to the appraiser. It is assumed that only typical right-of-way, ingress and egress and utility easements are recorded against the properties, and that no other easements may exist that adversely impacts the subject site;

2) The improvements are currently 100% vacant and available for use as a laundry facility. However, our discussions with various market participants reveal that demand for a laundry facility at this location is limited. Since the interior improvements including the water tanks, and the laundry wash and dry equipment as well as conveyer systems are all attached to the property and can be sold off at auction, we will assume the building as vacant and available as an industrial manufacturing or warehousing building;

3) and lastly, as noted above, Building A is currently is in poor condition due to water damage and collapsing roof which would require significant redevelopment. Despite our request, no new cost estimate was provided for our perusal. According to a cost estimate provided by the owner in March 2008, a cost estimate of $650,000 or approximately $25.95 per square foot has been submitted as a cost to repair the roof and convert the western wall to a roll up loading dock. Per agreement and discussion with the client, we have relied on the former owner's representation of the cost estimate and have considered the amount to be a reasonable estimate of cost to cure as of our date of value.

Additionally, as reported by the receiver and noted during our inspection of the property, Building B has had significant water damage to the interior due to leaking roofs. A cost estimate for a roof repair has not been commissioned but the receiver has estimated approximately $100,000 for roof repairs. Based on Marshall Valuation, coupled with our discussions with

Norm Barnes of Barnes Construction, a reasonable estimate of roof repair and patching is approximately $1.00 per square foot. Based on 87,557 square feet in Building B, a cost estimate of approximately $90,000 is deemed reasonable to repair the leaking roofs.

Based on the above, an aggregate cost to cure estimate of $740,000 will be considered to bring the subject to average condition.

In preparation of this "summary" appraisal report, we also inspected the surrounding neighborhood, consulted with city officials regarding zoning and General Plan issues and consulted with local area brokers.

Regional and local economic trends have been analyzed and reported in the appraisal. Further, we have analyzed and reported general freestanding industrial market trends relevant to the subject property. We were not provided with any preliminary title report. In an effort to render a reasonable value estimate, information on numerous real estate sales, leases and expense comparables have been gathered and analyzed. The data regarding these transactions was considered in the manner in which it was provided to the appraisers.

Our investigation included discussions with city officials regarding land use and zoning requirements. Transaction data was confirmed with market participants such as buyers, sellers, brokers or agents. No data has been included or relied upon which is not believed to be accurate.

Two of the three traditional approaches to value were employed in the valuation process: the Sales Comparison and Income Approaches. The Cost Approach was not utilized due to the age of the improvements and because it is not typically considered by buyers or sellers of similar properties. The quality and quantity of available data and the relevance of each approach to valuation of the subject property was analyzed to derive a final estimate of value.

## PROPERTY IDENTIFICATION

The subject property consists of a special use, industrial project comprised of three buildings situated on a 4.61-acre site. The improvements were originally constructed for and, up to November 2008, were utilized as a special use - commercial laundry facility. As of November 2008, the facility was closed down and is currently 100% vacant and available for use as a manufacturing/heavy industrial building.

The property is located along the east side of Murray Avenue, within the City of Gilroy, Santa Clara County, California. The property has a physical address of 8190 Murray Avenue Gilroy, California. The subject is further identified as Santa Clara County Assessor's Parcel Number 841-59-022.

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 13 of 89

## ASSESSED VALUATION AND TAXES

In the State of California, real estate is assessed at 100% of market value as determined by the County Assessor's Office. The maximum tax rate cannot exceed 1% of the property's appraised value, plus any special assessment bonds or fees approved by voters. The reassessment upon ownership transfer is based upon the sales price of the property, which is presumed to be the fair market value of the property. Barring any assessments, the assessed valuation may be increased by a maximum of 2% per year. The assessed values for the Assessor Parcel Number for the 2007/2008 tax year are as follows:

| 2009-2010 TAXES | |
|---|---|
| Assessor Parcel Number | 841-59-022 |
| **Assessed Values:** | |
| Land: | $875,249 |
| Improvements: | $5,716,204 |
| Personal property | $0 |
| Total Assessed Value: | $6,591,453 |
| | |
| **Direct Assessments:** | |
| SCVWD Clean Safe Creeks | $1,830.50 |
| SCCO Vector Control | $14.82 |
| Mosquito Abatement #2 | $100.32 |
| County Library | $1,163.78 |
| SCVWD Flood Control | $594.56 |
| Total: | $3,703.98 |
| | |
| Direct Assessments: | $3,703.98 |
| Annual Tax (AV * Tax Rate) | $81,819.71 |
| **TOTAL TAX DUE 2007/2008** | **$85,523.69** |
| | |
| Tax Area Code: | 02-000 |
| Tax Rate: | 1.24130% |

The tax area is 02000. According to the Santa Clara County Tax Collector's Office, the taxes have not been paid for the 2009-2010 tax year and the prior year taxes of $43,895.68 is currently delinquent.

## OWNERSHIP AND SALES HISTORY

According to public records provided by RealQuest, the subject property is currently vested in:

### LOHREY INVESTMENTS LLC

According to County Records, the last transfer of title was recorded on October 16, 1998 for a purchase price of $10,000,000. This transaction was recorded in document number 14447682. The owner reported acquired the property from 8190 Murray Avenue Associates LP.

However, in discussions with the lender, Vestin Mortgage, the owner had filed for bankruptcy around September 2008 and the property went into foreclosure proceedings. A receiver, Mr.

Richard Schwalbe (415-254-8919), was put into place around October 2008.  Laundry operations at the property were shut down in November 2008.  We are not aware of any other transfers of ownership within the last three years.

The receiver, Mr. Schwalbe, has noted that an offer to purchase had been recently submitted but remains confidential.  The offer was reportedly from Angelica, a commercial laundry company who was a competitor to West Coast Linen.  Mr. Schwalbe noted that the offer price is still being negotiated but that it was around $4,500,000 to $5,000,000.  Furthermore, he noted that the offer was contingent on additional due diligence as related to current property condition and the availability of the sewer allocation credits.  Despite our request, no copies of offers were presented for our review.  We have not considered any such offers to purchase in our analysis and have presented the above for informational purposes only.  Mr. Schwalbe also noted that there was additional acquisition interest by Crothall Laundry Services.  Crothall Laundry Services is a UK based laundry service company.  No additional information was provided.

## COMPETENCY STATEMENT
We have appraised this property type and have the knowledge and experience necessary to complete this appraisal assignment. Please see the appraiser's qualifications in the Addendum of this appraisal report for additional information.

# SECTION II—DESCRIPTIVE INFORMATION

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 16
of 89

## AREA ANALYSIS

The subject property is located in the San Francisco Bay Region, an area with a population of approximately 7.0 million, which is comprised of the nine counties bordering San Francisco Bay. The San Francisco Bay Area is characterized by a moderate climate, vibrant economy, and one of the highest standards of living in the United States.

Santa Clara County is the most populous of the nine counties comprising the San Francisco Bay Region with approximately 1.8 million residents. As of January 2009, the population of Santa Clara County was 1,857,621, up 1.1% from January 2008. According to the Association of Bay Area Governments (ABAG), in 2010 total population in Santa Clara County is expected to increase to 1.9 million. Moderate growth is due to most developable areas of the county being built-out. San Jose is the largest community in the county and is the third largest city in California, recently surpassing San Francisco.

Santa Clara County extends south from the southern tip of San Francisco Bay, bounded by the Diablo Mountain Range to the east and the Santa Cruz or coastal mountain range to the west, to the point where the two ranges converge near the San Benito County line. The area generally referred to as the Silicon Valley is centered within Santa Clara County, and includes portions of Southern San Mateo County, Southern Alameda County and Santa Cruz County.



Excellent transportation routes and linkages with major cities within and without the region are primary reasons for the advancement of business activity in Santa Clara County. The Norman Y. Mineta San Jose International Airport provides commercial air service within the area. Passenger totals exceeded 10.7 million in the 12 months ending November 2005. The airport handled over 190 million pounds of cargo in the same period. Comparative, year-to-date data through November 2004 and 2005 indicate a 0.8% increase in total passengers, but a 13.1% decline in pounds of cargo. The latter was driven by a decrease in mail, freight and domestic cargo.

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 17 of 89

The Altamont Commuter Express (ACE) train accommodates commuters from Stockton to The South Bay Area with a downtown San Jose station. U.S. Highway 101 (U.S. 101) and Interstate 280 provide major north-south linkages, running generally east/west through the county.  Both of these routes connect San Jose to San Francisco; U.S. 101 also continues south to Los Angeles. Interstate 280 becomes Interstate 680 and provides access into East Bay cities and links The Bay Area to Sacramento. Interstate 880 (also as S.R. 17) runs north/south through the county, linking Santa Cruz and Oakland.  As in other Bay Area Counties, Santa Clara County suffers from traffic congestion. Although many routes are at gridlock during peak commute hours, routes are being extended or expanded, public transportation is being developed, and the jobs/housing balance is becoming a geographic issue. The prospects for improvement in the transportation system in keeping with population growth are better than for many other Bay Area communities.

Santa Clara County is a major employment center, generally accounting for a greater proportion of employment than its proportion of population within the region. The largest employers are high technology firms such as Hewlett-Packard, Intel, Cisco Systems, Sun Microsystems, Lockheed Martin Missiles & Space, IBM and Applied Materials. The most significant sub sectors of the economy include microelectronics, computers and computer peripherals, software, internet services, medical equipment and biotechnology.

As will be discussed in greater detail in the next section, the current economic crisis has greatly impacted financial markets both on a national and international level.  The effects of the current economic crisis have been felt in the Bay Area, despite historically above-average income and employment levels.

Traditionally, Santa Clara County has had one of the highest rates of workforce participation in the country.  However, unemployment has risen sharply in the past year as the country grapples with the current economic crisis.  According to the most recent labor market information, the unemployment rate for the Santa Clara County during July 2009 was 11.7% up significantly from 6.2% during the same time a year earlier.  This compares with an unemployment rate of 12.1% for California and 9.4% for the nation during the same period.  This significant increase in unemployment is adversely affecting the local economy.  Many consumers are considerably pessimistic about their financial situation and are reluctant to spend monies on non-essential purchasing which leads to a continued spiral of unemployment and financial instability.  Many analysts believe more lay-offs are eminent in the near and we are likely to see unemployment go up before showing improvement.

The current economic crisis has greatly impacted financial markets both on a national and international level.  The effects of the current economic crisis have been felt in the Bay Area, despite historically above-average income and employment levels.

**Economic and Political Forces**
The United States economy is experiencing a great deal of uncertainty; paralyzed between slowing growth, accelerating prices and a major banking and credit crisis.  Most economists agree on the primary source of the problem.  Sub-prime and adjustable rate mortgages, added with a long-term trend of rising housing prices had encouraged borrowers to assume difficult mortgages in the belief they would be able to quickly refinance at more favorable terms.  The originators of these loans frequently packaged and sold these risky assets as Mortgage-Backed Securities.  However, once interest rates began to rise and the housing prices dropped, foreclosures on these loans stockpiled and the lenders and investors left holding the paper are

suffering tremendous losses.

Housing prices began falling in the summer of 2005 and several financial institutions have fallen as well. IndyMac, Washington Mutual, Lehman Brothers, Bear Sterns, Merrill Lynch, Wachovia, Fannie Mae, Freddie Mac and AIG, have all suffered tremendous losses to the point of complete, or near, collapse.  In early January, 2009, Bank of America indicated that it's in financial trouble and may need more funds from the government, and Citibank announced that it will be splitting in two, after its fifth straight quarterly deficit.   The implications to the demise of these institutions have impeded the flow of credit, further depressing the economic situation.  The impact of the credit crunch doesn't stop at our border, either, as the entire global economy is suffering from the crisis.

In an effort to quell the burdens of the crisis, in February of this year President Obama signed the American Recovery and Reinvestment Act into law, also known as the Stimulus Package.  At $787 billion, it is the largest spending bill in U.S. history.  The Package is intended to save millions of jobs and "bring the country back from the brink of economic catastrophe."  The plan pumps money into infrastructure projects, health care, renewable energy development and conservation, with twin goals of short-term job production and longer-term economic viability.  Additionally it provides for tax breaks, dishes out billions to states so they can head off deep cuts and layoffs, and provides financial incentives for people to start buying major purchase items once again such as homes and cars.  Most critics agree it will take time to see a noticeable change and also fear the uncertain long-term consequences, but hopefully a short-term result will be a boost to consumer and investor confidence and an ease on tightened credit conditions.

The Stimulus Package was approved four months after approval of a major relief effort dubbed the "Bailout Package" was approved.  Unlike the Stimulus Package, the Bailout Package was aimed directly at our ailing financial institutions.  This law allows the Treasury Secretary to put as much as $700 billion in troubled assets, relieving the holders of bad loans in order to enable lenders to lend again.  This resulted in the Troubled Asset Relief Program (or TARP) funds provided by the government were intended to enable banks to begin lending again at levels seen before the crisis.  However, to date the majority of banks continue to restrict lending as to cushion against future, unforeseen losses from troubled assets.

The severe problems in our housing, credit and financial markets has resulted in a significant increase in job losses. Unemployment rates for many states, particularly the west, are higher than they've been in nearly 25 years, as the national unemployment rates nears double digits.  Steep declines are continuing in the area of manufacturing, but they have stabilized in the areas of construction and several service-providing industries.

In California, one of the hardest hit states by sub-prime lending practices, the May unemployment rate was 11.5%, well above the national average.  In the housing market, home building levels have fallen to their lowest level in 17 years, and there has yet to be any recovery from the sharp declines of the last several years.  Job losses related to construction, financial institutions and real estate have contributed to a growing trend in unemployment.

The country has been in a recession since December of 2007, a panel of experts declared, confirming what many Americans already believed. The old record for the longest recession during the post-war period is 16 months, which was reached in the 1973-1975 and the 1981-1982

downturns. As to whether we are still in a recession, opinions are mixed. There are some indications we are no longer in a recession but with all the varying criteria, a definitive acknowledgement of that fact has not been declared by the Fed or any other credible agency.

On Wall Street, economic uncertainty has wreaked havoc. The Dow Jones Industrial Average reached a peak in October 9, 2007 of 14,165. One year later on October 10, 2008 the Dow closed at just 7,883. In mid-February, the Dow closed at an 11-year low, following weekend plan reports about the government's new plan to bail out Citi Group. The Dow closed at 7,115, the lowest since May of 1997. Even so, there have been signs of encouragement from Wall Street of late. On April 3, 2009, the Associated Press reported that the stock market had four straight weeks of gains during the month of March. The last time this occurred was during the months of September and October 2007. It is still too early to determine how much of a positive impact this will have on the economy as a whole.

For the first time since the 1930's, the Fed has decided to lend directly to securities dealers along with its unprecedented cut in its emergency lending rate. Ben Bernanke said that "those steps would provide financial institutions with greater assurance of access to funds." Since September of 2007, the Federal Funds Rates has been lowered from 5.25% to its current level of 0.25%. At its December meeting, the Committee established a target range for the federal funds rate of 0 to 0.25% and indicated that economic conditions are likely to warrant exceptionally low levels of the federal funds rate for some time. During their most recent meeting on June 24, 2009, the Fed once again held rates steady between 0-0.25% and pledged again to keep it there for "an extended period" to help brace the economy.



The Consumer Confidence Index™, based on surveys of American households prepared by the Conference Board, was at its lowest point earlier this year since the inception in 1967. In February of 2009, the Index plunged to 25, down from 37.4 in January. Since then, the index has improved. As of May, it stood at 54.9, up considerably from April (40.9.) The survey also showed that 44.7% of consumers believe that jobs are hard to get, which is down from 46.6% in April. "After two months of significant improvements, the Consumer Confidence Index is now at its highest level in eight months (Sept. 2008, 61.4). Continued gains in the Present Situation Index indicate that current conditions have moderately improved, and growth in the second quarter is likely to be less negative than in the first. Looking ahead, consumers are considerably

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 20 of 89

less pessimistic than they were earlier this year, and expectations are that business conditions, the labor market and incomes will improve in the coming months. While confidence is still weak by historical standards, as far as consumers are concerned, the worst is now behind us, "Lynn Franco, director of the Conference Board Consumer Research Center, said in a written statement.

As the commercial real estate market grapples with current economic uncertainty and tightening credit, we have begun to see a reduction in the number of offerings and sales for most property types. After a decreasing trend over much of this decade, capitalization rates have clearly shown upward pressure over the past year. The lack of available financing has played a significant role despite low interest rates. Few buyers qualify for lenders' tightening requirements and some lenders have become very selective on what properties they will lend. Rent levels have flattened or declined for practically all property types. According to local real estate brokers, some properties in foreclosure, or almost in foreclosure, are coming available and there are buyers that are waiting for "fire sale" prices. Even so, for the most part, commercial real estate has remained relatively stable. We expect capitalization rates will continue to increase in the near term for all property types. For most property types, we expect to see continued decreasing asking rental rates and increases in vacancy during 2009 before any sign of market recovery.

### How Will We Know When The Worst Is Over?
The current downturn is shaping up to be worse than the recession of 1990-91 and the prolonged downturn that accompanied the 2000/2001 dot-com bust, according to an October 30, 2008 article published in the <u>Wall Street Journal</u>, entitled "Economists Search for End of Woes". Banks are cutting back on lending, consumers are spending less, companies are shedding jobs amid sinking profits, and the housing bust that triggered the slide persists.

The article opines that there are five signal areas that economists are watching as indicators of a turn-around:

- One early sign of recovery will be when more banks are easing lending standards rather than tightening them.

- The key to how much further home prices fall is how fast the glut of empty homes is absorbed. As excess supply decreases, home prices will eventually stabilize.

- Willingness of consumers to buy big-ticket items such as cars, furniture, appliances and electronics.

- Improvement in the labor market, with declining unemployment.

- Stabilization of the stock market. The stock market, for all its imperfections, is one of the best indicators of corporate health.

-

Our sense is that economic woes will be with us for a while, particularly until the issue of defaulting mortgages is favorably resolved. We are encouraged that the volume of sales in foreclosure and short sale properties is increasing throughout the Bay Area.

### Real Estate Overview
While the U.S. economy continues to suffer the ill effects of the post-credit market extremes, there is evidence that the decline is slowing and we are starting to see a few signs of entering into a period of stabilization. In the Second Quarter of 2009, RERC's average going-in capitalization

rates increased from 0 to 20 basis points for all property types. Since commercial real estate is a lagging indicator to the economy, RERC estimates stabilization in the economy to occur before year-end 2009 with strong signs of this in the second quarter, and commercial real estate following suit approximately 12 months after stabilization occurs in the economy. That means stabilization in the commercial real estate industry will not begin until mid-2010.

The preferred investment properties, nationwide, for institutional investors in the Second Quarter of 2009 were Apartments. Industrial warehouses placed second followed by central business district properties in third and retail neighborhood properties in fourth. Industrial R&D properties were the fifth preferred real estate investments nationwide followed by industrial properties in sixth. Suburban offices ranked seventh followed by regional malls in eighth and retail power centers in ninth. The least favorable real estate investments were hotels. The property preference ratings are taken from the <u>Second Quarter 2009 (Flash) Real Estate Investment Survey</u>, published by Real Estate Research Corporation (RERC). Internal rate of return expectations ranged from a low of 7.0% to a high of 14.0%, with an average of 9.3% for central business district office, 9.8% for suburban office, 9.4 % for industrial warehouse, 10.2% for R&D, 10.3% for industrial flex, 9.6% for regional malls, 10.1% for power retail centers, 9.5% for neighborhood retail centers, 8.9% for apartments, and 12.2% for hotels.

Overall "going-in" capitalization rates ranged from 6.0% to 14.0% with an average of 7.9% for central business district office, 8.4% for suburban office, 8.4% for industrial warehouse, 8.7% for R&D, 9.1% for industrial flex, 7.9% for regional malls, 8.7% for power retail centers, 8.2% for neighborhood retail centers, 7.4% for apartments, and 10.1% for hotels. Terminal capitalization rates ranged from 6.5% to 12.5% with averages ranging from 7.7% to 10.6%. Rental growth expectations ranged from -8.0% to 7.0% with averages ranging from 0.7% to 1.8%. Expense growth expectations ranged from 0.0% to 3.5% with averages ranging from 2.6% to 2.8%.

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 22
of 89

| REAL ESTATE INVESTMENT CRITERIA BY PROPERTY TYPE | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Second Quarter 2009 | | | | | | | | | | |
| | OFFICE | | INDUSTRIAL | | | RETAIL | | | APARTMENT | HOTEL |
| | CBD | Suburban | Warehouse | R&D | Flex | Regional Mall | Power Center | Neighborhood /Community | Apartment | Hotel |
| **Pre-Tax yield (IRR)(%)** | | | | | | | | | | |
| Range | 7.0 - 12.0 | 7.5 - 13.0 | 8.0 - 12.0 | 8.5 - 13.0 | 7.8 - 13.0 | 8.0 - 13.0 | 8.0 - 14.0 | 7.0 - 14.0 | 7.0 - 11.0 | 10.0 - 14.0 |
| **Average** | 9.3 | 9.8 | 9.4 | 10.2 | 10.3 | 9.6 | 10.1 | 9.5 | 8.9 | 12.2 |
| **Going-in Cap Rate (%)** | | | | | | | | | | |
| Range | 6.8 - 10.0 | 7.3 - 10.0 | 6.8 - 12.0 | 7.0 - 10.0 | 7.5 - 14.0 | 7.0 - 9.0 | 7.3 - 12.0 | 6.8 - 10.0 | 6.0 - 8.5 | 9.0 - 12.0 |
| **Average** | 7.9 | 8.4 | 8.4 | 8.7 | 9.1 | 7.9 | 8.7 | 8.2 | 7.4 | 10.1 |
| **Terminal Cap Rate (%)** | | | | | | | | | | |
| Range | 6.5 - 10.0 | 7.8 - 10.5 | 7.3 - 10.0 | 8.0 - 10.5 | 8.0 - 12.0 | 7.5 - 9.5 | 8.0 - 10.0 | 7.0 - 10.0 | 6.5 - 9.0 | 9.0 - 12.5 |
| **Average** | 8.2 | 8.7 | 8.6 | 9.0 | 9.3 | 8.2 | 8.9 | 8.5 | 7.7 | 10.6 |
| **Rental Growth** | | | | | | | | | | |
| Range | -5.0 - 4.0 | -8.0 - 5.0 | -5.0 - 3.0 | -3.0 - 3.0 | -1.3 - 7.0 | -1.0 - 3.0 | -2.3 - 3.0 | -2.0 - 3.0 | -1.0 - 3.0 | -2.3 - 3.0 |
| **Average** | 1.0 | 1.0 | 1.1 | 1.2 | 1.6 | 1.2 | 0.9 | 1.3 | 1.8 | 0.7 |
| **Expense Growth** | | | | | | | | | | |
| Range | 1.3 - 3.0 | 1.3 - 3.0 | 0.0 - 3.0 | 0.0 - 3.5 | 1.3 - 3.0 | 2.0 - 3.0 | 1.3 - 3.0 | 0.0 - 3.0 | 1.5 - 3.0 | 1.3 - 3.0 |
| **Average** | 2.8 | 2.7 | 2.7 | 2.7 | 2.7 | 2.8 | 2.7 | 2.7 | 2.7 | 2.6 |

**Conclusion**

Historically, the Santa Clara County region has been considered a desirable place to both live and work. Physical features and a strong local economy attract both businesses and residents. It is a worldwide leader in technology and a regional employment center, with an increasingly diversified economy. While housing affordability and traffic congestion will continue to be problems, residents remain among the most affluent in the country.

The current national financial crisis and continued economic uncertainty has had a negative impact on the entire Bay Area. New development and economic growth have stalled and unemployment is on the rise. In the short term, the local economy is fully in a recession. With significant unemployment statistics, coupled with declining property values and inadequate stimulus of the economy, many companies have restructured or closed down. However, in the long-term, the local economy is expected to continue to grow at a moderate, well-founded rate. The intrinsic desirability of the region, its foundational economics, projected jobs and population expansion, and a dwindling supply of readily developable land give strong support to real estate values and their potential for long term increase.

**CITY/NEIGHBORHOOD OVERVIEW**

The subject property is located in the City of Gilroy. Nestled between the Diablo and Santa Cruz mountains in the Santa Clara Valley, Gilroy is situated in South Santa Clara County at the crossing of U.S. Highway 101 and State Highway 152. Gilroy is located in the southern portion of Santa Clara County (also known as the South County area), approximately 25 miles south of central San Jose, and approximately 77 miles south of San Francisco. The city is within a short driving distance of Monterey Bay, Santa Cruz, San Jose, the San Joaquin Valley, and the San Francisco Bay Area.



Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 24 of 89

Historically, the City's economy has centered on agriculture. While a variety of crops find prosperous growth in the Gilroy area, the City is most well known for its garlic production and processing. Garlic product development and processing are major employers for the City's residents

However, over the last 10 to 15 years, with the rapid growth of San Jose to the north, the character of Gilroy has begun to change. Gilroy has become more of a bedroom community for people employed in the North County area. The population of the South Valley cities of Gilroy and Morgan Hill grew rapidly during the 1970s and 1980s. Although it has stabilized over the last few years, Gilroy and Morgan Hill continue to have increases in population.

The population growth in the cities over the course the course of this decade has tended to be minimal with figures ranging between 1 and 3% as the norm. The figures provided by the California State Department of Finance for Gilroy and Morgan Hill region below demonstrate more of the same over the past two years:

|  | 2007 | 2008 | % Change from 2007 | 2009 | % Change from 2008 |
|---|---|---|---|---|---|
| Gilroy | 49,362 | 50,947 | 3.2% | 51,508 | 1.1% |
| Morgan Hill | 38,204 | 39,051 | 2.2% | 39,814 | 1.9% |

While demand for new housing units is strong, a slow growth community attitude will continue to limit population growth in the South Valley over the near-term. Nevertheless, population growth is expected to exceed overall growth in the county.

The Association of Bay Area Governments (ABAG) in projections 2005 outlined the projected population changes as follows:

|  | 2010 | 2015 | 2020 |
|---|---|---|---|
| Gilroy | 60,000 | 62,300 | 64,600 |
| Morgan Hill | 45,100 | 46,800 | 48,900 |

The South County area is serviced by two major arterials: Highway 101, also known as the "South Valley Freeway," and the Monterey Highway, which was formerly old Highway 101. Both of these arterials run in a southeast to northwest direction accessing San Jose to the north and Gilroy to the south. The South Valley Freeway was constructed around the cities of Morgan Hill and Gilroy, thereby reducing old Highway 101 to a "business" highway. There are three major arterials leading from Highway 101 to Monterey Road and the central portion of Morgan Hill. The first highway exit into Morgan Hill for southbound travelers on Highway 101 is Cochrane Road, servicing the northern area of the city, followed by Dunne and Tennant Avenues, which serve the central and southern portions of the city, respectively.

Commercial development over the last ten years has centered along these three arterials between Highway 101 and Monterey Road. There are two major arterials leading from Highway 101 to Monterey Road in the unincorporated area of San Martin. San Martin Avenue is the next exit south of the Tennant Avenue exit in Morgan Hill. Masten Avenue is the next exit to the south.

The subject property is located less than one-half mile southwest of the first freeway exit south of Morgan Hill, the San Martin Avenue exit. Highway 101 significantly reduced travel time between the cities of Gilroy and Morgan Hill; however, it hurt business trade along Monterey Road.

The city is rail served by Union Pacific Railroad and Del Monte and CalTrans passenger trains. The San Jose International Airport is 30 miles north, and the South County Airport, which serves general aviation exclusively, is five miles north.

The labor market in the Gilroy area is divided between a number of market areas with four areas competing for the largest share of the labor force. Manufacturing, retail, trade and services all have approximately the same percentage of the labor force. Agricultural, which includes migrant farm workers and is more seasonal, competes also with those categories. According to the Gilroy Chamber of Commerce, the top employers, not including government or health services, range from 225 to 1,000 employees. ConAgra Foods has 800-1,000 employees while Gavilan College, Giacalone Electrical Services, Wal-Mart and Christopher Ranch, all have anywhere from 225-350 employees.

The majority of recent residential development has been in the western portion of Gilroy, in particular. The largest residential development within the City of Gilroy is "Eagle Ridge," which is located in the southwest quadrant of the city. The project includes 853 residential units and an 18-hole golf course.

According to DataQuick, the median price paid for a home in the Bay Area in June 2009 was $356,000, which is down 28.7% from June 2008 when that figure was $458,000. The City of Gilroy is one of the most affordable cities in which to own a home in Silicon Valley.

However, as has been noted throughout the Bay Area, the residential market has slowed considerably with a greater number of houses on the market for longer periods of time. The sub-prime lending crisis and credit crunch have impacted the south valley residential market. We expect housing prices will continue to decrease as more homeowners can not afford to make payments on their adjustable loans and it becomes more difficult for new homebuyers to qualify. Nevertheless, population growth is expected to exceed overall growth in the county.

Located in the Silicon Valley region, about one-third of Gilroy residents commute to work in the myriad of high tech industries for which the region is named. The skilled, informational-related technology labor of Gilroy is supplemented by the manufacturing trade and a strong local retail community.

The nearest retail establishments to the subject property are in Gilroy including a major retail outlet center on the east side of the South Valley Freeway (Highway 101) at Leavesley Road, adjacent to Southpoint Business Park. The center opened in 1990 and has been very successful. It draws shoppers from the entire region. Expansions of 183,000 and 77,000 square feet were completed in 1994 and 1995, respectively, bringing the total area to over 600,000 square feet. The outlet mall appears to be nearly 100% occupied with over 150 stores. The outlet center attracts 12,000 daily visitors boasting $285.00 per square foot in sales. In the mid 1990s, a Wal-Mart was constructed just south of the outlet center. A Hometown Buffet was completed near Wal-Mart.

Major new developments, which are retail in nature, have been recently completed. Gilroy Crossing, which broke ground in 2003, is located on the southeast quadrant of Highways 152 and 101. This center contains 458,500 square feet. Major tenants include Target, Bed Bath & Beyond, and Kohl's. The entire project was completed in 2004. On the northeast quadrant of Highways 152 and 101 are The Home Depot and a Lowe's Home Improvement Center, which were also completed in 2004.

Gilroy and its adjacent neighbor, Morgan Hill, have growth control measures in place that limit growth in all areas, including residential. This began as the result of the lack of sewer capacity for development. The two cities are intertwined in a very crucial area, namely, the sewage treatment plant and facilities. Both cities share in its usage, therefore, splitting the plant's capacity. Gilroy adopted its "RDO," or Residential Development Ordinance, in order to promote an orderly growth that does not exceed their city's ability to provide adequate and efficient public services.

In order to develop residential property in Gilroy, one must first secure allocations (1 for every unit) and then applies for project approval. Every two to three years applications can be made for allocations under the RDO "competition" wherein the developers parade their projects before the City Council in hopes of a favorable decision. Those awarded allocations can then proceed with tentative map approval. The catch to the program is that there are only a small number of allocations available for each competition.

Gilroy has 1,110 acres of land zoned for light or heavy industrial use. Of this, 600 acres (54%) are vacant and available in parcels ranging in size from 0.5 to 100 acres. Terrain is generally level and drainage excellent. Subsoil is firm and piling is not generally required. There are five major business parks in the City of Gilroy containing approximately 40 R&D and light industrial buildings. The primary industrial areas in Gilroy are the Forest Street Business Park, Obata Business Park, and the Southpoint Business Park. There is a proposed industrial park containing 108 acres, which is known as the McCarthy Business Park. The initial plan for this proposed industrial park was approved in February 2000 by the City Council, and is expected to be developed over the next ten years.

Obata Business Park is located on the east side of Highway 101. This park has somewhat circuitous access and is improved with a combination concrete-tilt up and metal industrial oriented buildings. Existing uses include light industrial, warehouse, manufacturing, and R&D.

Other business parks in the area include the Forest Street Business the Southpoint Business Park, and the proposed McCarthy Business Park. The proposed McCarthy Business Park is located to the south and east of Gilroy Crossing. This is a planned industrial park that is to be developed over the next ten years. Currently, construction of the infrastructure is completed. The park consists of 108 acres. The plan is to develop the park with individual industrial buildings either on a build to suit or speculative basis. The first site has been purchased by an industrial/condominium developer.

The Forest Street Business Park is located north of Leavesley Road on the west side of North Forest Street. The Obata Business Park is located on the west side of Highway 101, with access via Luchessa Avenue. This park has somewhat circuitous access and is improved with a

Case: 09-10007   Doc# 102-2   Filed: 07/23/10   Entered: 07/23/10 20:03:43   Page 27
of 89

combination concrete-tilt up and metal industrial oriented buildings. Existing uses include light industrial, warehouse, manufacturing, and R&D. The Southpoint Business Park is located on the east side of Highway 101, just south of the Outlets.

There is a proposed industrial park containing 108 acres, which is known as the McCarthy Business Park. The proposed McCarthy Business Park is located to the south and east of Gilroy Crossing. This is a planned industrial park that is to be developed over the next ten years. Currently, construction of the infrastructure is completed. The park consists of 108 acres. The plan is to develop the park with individual industrial buildings either on a build to suit or speculative basis. The first site has been purchased by an industrial/condominium developer.

Office complexes are disbursed throughout the City. The most recent large office project that was constructed is located on Santa Teresa and First Street, in the western area of the town. This project consists of a two-story office building, is known as The Piazza and has some retail tenants as well as office. This project was completed in 2003 and consists of approximately 50,000 square feet. This project has been well received in the market place and is fully leased. There is a three-story project under construction on Monterey Road, in the downtown area of Gilroy, which will have retail/commercial on the first floor and residential units on the upper levels. This project was completed in 2006.

Significant new construction and leasing activity has occurred within the nearby city of Morgan Hill as well. The majority of construction that has occurred over the past several years has been located in the northern portion of Morgan Hill along the Cochrane Road neighborhood. Central to the Cochrane Road neighborhood is the interchange of Cochrane Road and the South Valley Freeway (Highway 101). This neighborhood has been in transition from agricultural to service commercial and industrial over the past twenty years. Prior to 1982, Cochrane Road was nothing more than a country road linking the South Valley Freeway with Monterey Road. Today, almost all the fruit stands and agricultural operations which once were the dominant uses have been replaced by office/industrial development, namely, in the form of four existing business parks and the Cochrane Plaza Shopping Center.

Sutter Business Park was developed in 1987 and is located on the north side of Cochrane Road. This business park contains approximately 16 parcels totaling 25 acres. This park is about 80% built out with R&D, manufacturing, and flex office space.

Cochrane Business Ranch is located north of Cochrane Plaza and was developed in 1986/1987. This business park consists of approximately 25 acres and is 100% built out.

Morgan Hill Ranch is the largest business park in the south county with 387 acres. The gateway to Morgan Hill Ranch is the Cochrane Plaza Shopping Center. This center is located on the southwest quadrant of Cochrane Road and the South Valley Freeway. There is an Extended Stay America is located directly south of Cochrane Plaza Shopping Center. West of the shopping center on the southwest corner of Cochrane Road and Butterfield Boulevard there is a 96-unit, multi family affordable housing project. The original plan for a mixture of retail, residential, and industrial uses was altered to concentrate entirely on industrial and commercial uses such as R&D, industrial, and office space. Digital Drive is the most recently completed road in the business park. Digital Drive contains approximately 23 lots ranging from 0.76 to 3.6 acres. Digital Drive will be improved with industrial/R&D buildings ranging in size from 9,700 to

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 28 of 89

50,000 square feet.  Because of the available parking, the buildings can also be built out as mostly office space.

The area within the loop of Digital Drive is known as Digital Island.  Digital Island is improved with R&D condominiums and an office condominium building.  The R&D condos are all sold out.  The office condominium project is almost sold out.  Users include medical and professional office space in the office project.

### Immediate Environs
The subject property is located on the east side of Murray Avenue, immediately west and parallel to Interstate 101, and south of Leavesley Road (Highway 152 to the west).  An immediate area map is presented below.



The primary demand of the immediate area is the mixed commercial, industrial and residential area at the Leavesley Road interchange to Interstate 101.  At this location, uses consist of food service, limited service hospitality and lodging, retail and other commercial services.

The commercial uses along the east side of Highway 101, anchored by the Gilroy Outlet Mall were previously discussed.  The west side of Highway 101 is the primary access route into the downtown area of Gilroy and to much of its older residential neighborhoods.  Murray Avenue is the first signalized intersection and the corner is dominated by restaurants, service station and other high volume commercial uses.

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 29 of 89



Within the vicinity of the subject property, Murray Avenue is improved with curbs, gutters, and streetlights. There is room for two lanes of traffic, one in each direction. Murray Avenue runs roughly north to south. To the north, Murray Avenue runs parallel to Interstate 101 and connects to Cohasset Road. Murray road dead-ends to the south, approximately ½ mile at 100F.

Directly north of the subject is former 84 Lumber lumberyard and construction supplies center. This site is currently vacant and according to city planning, a redevelopment project is currently being discussed on site. The proposed project will include a mixed use office/retail and warehousing project and but is still in the early stages of planning. Redevelopment is at a standstill and is anticipated for 2010 through 2011. Further north is a Motel 6 and other commercial uses. To the east of the subject is a Santa Clara Valley Water District Parcel which is used for and improved with a flood control channel. Further east is Highway 101.

To the south of this property is the Wagon Wheel Mobile Home Village which consists of a 121 pad mobile home park developed in the 1960's. Directly south of the subject is a Gilroy Health Care and Rehabilitation Center. Further south, land use changes to single family residential and supporting civic uses such as the South Valley Jr. High School.

Overall, the subject is atypical in the marketplace as it represents a heavy industrial building and a former special use property as a commercial laundry and linen service facility within a mixed use industrial area of Gilroy. As industrial, however, the subject benefits by being in close proximity to this to Highway 152 and Interstate 101. The subject has good access to both local and regional transportation.

### Area Conclusion
In summary, the subject is located in the South County City of Gilroy. The subject is located in close proximity to the Gilroy Outlet Centers, an area that has experienced a significant amount of

retail development over the past few years. There are plans for the expansion of the Southpoint Business Park, a major industrial park in close proximity to the subject.

The subject benefits from being located near the new developments and adjacent to Interstate 101. Access to Highway 101 is via a full freeway interchange just northeast of the subject property along Highway 152. While housing prices have continued to increase, Gilroy remains one of the most affordable places to live in the Silicon Valley. We believe the short term and long term outlook for the area to be good.


## REAL ESTATE MARKET OVERVIEW

The Silicon Valley Industrial market includes three distinct property types: warehouse, manufacturing, and R&D. There is some crossover among these three types. The subject property consists of a special use industrial/manufacturing – heavy processing building. However, because of its available on site parking at a ratio of 1.2 stalls per 1,000 square feet it also competes in the warehouse industrial submarket.

Warehouses are defined in general as buildings with under 2/1,000 per square feet of parking, a clear height of 18 feet of greater, limited glass, dock and/or grade level doors and minimal build out. The subject is built out as approximately 18% office, which is greater than typical for a warehouse. The interior built out is more typical of a manufacturing building. Because of this the subject could be desirable to a warehouse user, or a manufacturing user that does not require a lot of parking. We will take this into consideration during the valuation of this property. We will discuss vacancy and leasing market conditions and sale market conditions for properties like the subject.

### Leasing Market Conditions

Colliers Parrish publishes a quarterly report tracking the vacancies and absorption for industrial product in Silicon Valley. The most recent report released is for the Second Quarter 2009. The subject completes in both the warehouse and industrial/manufacturing market. Again, the subject has ample parking for the manufacturing use, but has very little office build out, making it also competitive in the warehouse market. We will discuss the industrial/manufacturing and warehouse market conditions for both the Silicon Valley and the submarket area of South County where the subject is located.

### Industrial/Manufacturing Market Overview

After three years of single-digit vacancy rates, the industrial market increased to double-digits in the year's first quarter and increased higher in the second quarter to 12.9% throughout the Silicon Valley.

Total available industrial space throughout Silicon Valley increases to 7.28 million square feet. This is the first time available space has been over seven million since the third quarter of 2003. In the Silicon Valley, gross absorption for the second quarter was 607,588 square feet, 21.2% less than the two-year quarterly average of 771,030 square feet. Net absorption was negative for the ninth consecutive quarter.

Average industrial rental rates for transactions completed in the Valley decreased to $0.72 per square foot, triple net, down from $0.79 per square foot during the first quarter. Rental rates for

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 31
of 89

industrial space have decreased over the past year throughout Silicon Valley.

The subject is located in the City of Gilroy, which is in the South County area of Silicon Valley. Morgan Hill is also in the South County submarket and is located north of Gilroy. The subject's submarket area is considered the Gilroy/Morgan Hill markets.

In the City of Morgan Hill, there is approximately 2 million square feet of industrial space. As of the second quarter, the vacancy is 11.3%, which is actually down slightly from the first quarter when it was 13.6%. The average asking rental rate is $0.69 per square foot, triple net.

In the City of Gilroy, there is approximately 1.3 million square feet of industrial space. As of the second quarter of 2009 the vacancy rate was 26.2%, which is the same as the first quarter of 2009. This demonstrates the lack of activity in the market area. The average asking rental rate for industrial space in Gilroy is $0.73 per square foot, triple net.

**Warehouse Market Overview**
There is an estimated building base of warehouse space of 252 million square feet throughout the Silicon Valley. The cities with the largest building bases are San Jose and Fremont. Both of these submarkets had a slow second quarter with only 70,288 square feet of warehouse gross absorption. The warehouse vacancy rate throughout Silicon Valley was 10.3% during the second quarter, up slightly from the first quarter when it was 9.9%.

The average rental rate for warehouse space in the Valley was $0.50 per square foot, triple net. Rental rates range from a low of $0.38 per square foot in the City of Gilroy to a high of $0.58 per square foot in the City of Sunnyvale.

For the submarket area of Morgan Hill, there is an estimated 385,000 square feet of warehouse space. Vacancy as of the second quarter was 24.4%, unchanged since the first quarter of 2009. The average asking rental rate for warehouse space in Morgan Hill is $0.55 per square foot, triple net.

For the submarket of Gilroy, there is an estimated 3.2 million square feet of warehouse space. Vacancy as of the second quarter 2009 was 5.3%, down slightly from 6.9% during the first quarter. The average asking rental rate for warehouse space in Gilroy was $0.38 per square foot.

As previously noted, the subject could be desirable to a warehouse user, or a manufacturing user that does not require a lot of parking. Moreover, as noted above, the average asking rate for warehouse space is $0.38 per square foot per month and the average asking rate for industrial is $0.73 per square foot per month, triple net. Although vacancy rates are relatively stable from the same time last year, we feel that given the current weak economic market conditions, a market rent at the lower end of this range is more realistic until the overall real estate market recovers.

**Owner-User and Investor Market**
Overall, there remains some owner-user demand for commercial real estate. This is attributed to low interest rates that allow owner-users to purchase their own property at affordable mortgage payments, while also reaping the tax benefits of owning versus renting. Additionally, when users rent space, they are exposed to surges in rental rates that accompany periods of strong economic growth. When purchasing a property, an owner-user can have greater certainty about

long-term monthly payments. However, it has become so difficult to obtain financing that this has made it more difficult for owner-users to qualify to buy properties. Furthermore, the majority of potential buyers believe property values may continue to decline. Because of this, there has been very little activity. The lack of activity in the market place makes it more difficult to determine market values and makes it difficult to estimate the appropriate time adjustments as well.

The good news is that the SBA program continues to lend and is a good way for owner-users to purchase a property. Even so, overall, there are few active buyers in the market place today. We believe activity in the market place will increase if credit becomes more easily available and if the perception is that the real estate market has hit the bottom. It is our opinion that this has yet to occur.

If the subject property were leased it would be considered more appealing to an investor. Investors have also been sitting on the sidelines. Waiting for the credit market to loosen up and waiting to see if they believe the market has hit bottom. There are investors in the market place making "low ball" offers for properties. In general, the sellers do not wish to sell for what investors are willing to pay in today's market place. There are concerns that loans coming due over the next few years for commercial properties will account for a large increase in properties that are foreclosed on. As lenders have tightened their lending requirements (some lenders are just not even lending currently) and property values have decreased. Because of this, when loans come due, there is concern that the borrowers will not be able to refinance their loans when they are called. If this happens, the commercial real estate market will be headed for further downturns, with an increase of REOs.

## Market Conditions Summary

While the economy remains uncertain and the commercial real estate market has in some ways remained in a stand sill, we anticipate that long term outlook for properties like the subject is good. Even so, it may take a few years to see improvement in market conditions.

The subject benefits from being located in Gilroy which is in Silicon Valley, but is also one of the most affordable places to own or rent in Silicon Valley. Overall, demand is considered adequate, with fewer buyers than a year ago.

## SITE DESCRIPTION

The subject site is located along the east side of Murray Avenue, approximately 750 feet south off the Leavesley Road intersection, within the city of Gilroy, Santa Clara County, California. The following is a description of the site.

| | |
|---|---|
| Location: | 8190 Murray Avenue, Gilroy, CA |
| APN: | 841-59-022 |
| Shape: | The parcel is rectangular in shape; please refer to the Plat Map on the following page. |
| Area: | 4.61 acres or 200,812 square feet |

# PLAT MAP



| | |
|---|---|
| Topography: | The site is generally level and at street grade. The site has been graded to facilitate drainage which appears to be adequate. |
| Utilities: | Electricity, gas, water, sewer, and are available to the site. Upon construction of Buildings B and C |

in 1991, an on-site waste water treatment facility was also constructed. The facility allows reuse of approximately 70% of the water utilized in the laundry process.

In addition to adequate access to utilities on the property, the city of Gilroy has indicated that the subject property currently has a sewer allocation of 157,117 gallons per day and water at 203,567 gallons per day. If purchased at today's rates (Sewer Development Impact Fee of $3,608 per hundred gallons per day and Water Impact Fee of $5,431 per thousand gallons per day), the required allocation to operate the subject property would cost $6,774,354. ***Should the subject property not utilize its fully allocations for water and sewer, these allocations can be marketable. However, its marketability is beyond the scope of this appraisal assignment.***

**Flood Hazard:**

Te subject site is located in a Flood Zone "X," located in an area of undetermined but possible flood area, as identified by FEMA Map 060340-0002D dated August 17, 1998. It is our understanding that as a condition of federally related financial assistance, this zone does not require flood insurance.

**Seismic Hazards:**

Much of California and the San Francisco Bay Area are subject to earthquake faults. In general, the earthquake faults in this area seem to be of no greater hazard than other areas throughout the San Francisco Bay region. The subject property is not within an earthquake zone as identified by the official Alquist-Priolo Special Study Zone for active earthquake faults. No unusual seismic conditions are known to affect the subject property.

**Environmental Issues:**

A Phase I Environmental Site Assessment was provided for review. According to this report, there are no onsite or offsite sources of contamination. As such, for the purpose of this appraisal, it is assumed the site is "clean."

**Land Use Restrictions:**

We have reviewed an older property profile report prepared by First American Title Insurance Company. We have requested but have not

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 35 of 89

reviewed a recent Preliminary Title Report. We assume that there are no easements and/or encumbrances that may adversely affect the utility, marketability and/or value of the subject property.

Access and Visibility:            The subject property has excellent access to both local and regional transportation. Highways 152 & 101 are both located within ½ mile of the subject. The property has approximately 458 feet of frontage along Murray Avenue and approximately 400 feet of depth. Access to the subject property is provided by three curb cuts along Murray Avenue. Ingress and egress for the subject property appears to be adequate.

Comments: In summary, the subject sites consist of one rectangular shaped parcel containing 4.61 acres of land. The site is level and at street grade with all utilities available. In addition, the site has good access to both local and regional transportation and good visibility. It is our opinion the site has good functional utility and is well suited for the existing use. All public utilities serve the property. It has good frontage relative to size. No adverse site factors were noted.

## ZONING

The subject property is under the jurisdiction of the City of Gilroy and is zoned "CM" Commercial Industrial. The General Plan designation is General Industrial. The CM zoning classification is the broadest of zoning categories for commercial and industrial uses and allows for a variety of industrial related uses including automobile parts, sales and repair, building materials, clothing sales and service, dry cleaning, hospitals, hotels, R&D, Laundromats, light industrial uses, medical or dental uses and other manufacturing uses. The intent of the CM Commercial Industrial District is to provide areas in the City suitable for commercial uses of a low intensity which exist in combination with uses of a light manufacturing or light industrial nature. Ample landscaping and creative design are encouraged in the CM Commercial Industrial District.

Development standards under the subject's zoning district include the following:

| | |
|---|---|
| Minimum Lot Coverage: | None |
| Maximum Height: | 35 feet or 2 stories |
| | |
| Setbacks: | |
| Front: | 26 feet |
| Side: | None |
| Rear: | None |

Parking is determined by use. Manufacturing requires 1 space per 350 square feet while warehouse requires 1 space per 10,000 square feet. According to the planning department, the existing improvements are considered to be a legal and conforming use.

## IMPROVEMENT DESCRIPTION

We have based our improvement description on our physical inspection and building plans provided while inspecting the property. We were not provided with a copy of the plans, however, a floor plan showing the office areas built out in the subject property are presented in the Addendum of the report.

The subject property consists of an industrial property which was originally built for use as a commercial laundry facility. However, assuming that the equipment can be auction off, the building represents a shell manufacturing and heavy industrial building. The three building project consists of two, one-story and a two-story concrete buildings. The buildings were built in phases and the building breakdown as provided by the owner is as follows:

| Current Building | Size | Building Type | Year Blt | Condition |
|---|---|---|---|---|
| Building A | 25,048 sf | One and Two Story | 1967/68 | Poor |
| Building B | 87,557 sf | Two Story | 1991 | Average |
| Building C | 14,909 sf | One Story | 1991 | Average |
| Total | 127,514 sf | | | |

Building A was built in two phases, the original – approximately 7,000 square feet, is of wood frame construction and was built in 1968. A one and two story concrete block addition was completed in 1978. The exterior of Building A consists of painted wood siding and concrete block. The clear height is approximately 16 to 18 feet. In total, the building contains 25,048 square feet comprised of 19,048 square feet on the ground floor and 6,000 square feet on the second floor. Fenestration is average and typical and the second floor windows are bordered by a wood shingle mansard. The building has three grade level and one dock high doors. This building has suffered water damaged to the roof and the building will require significant renovation and redevelopment. Despite our request, no new cost estimate was provided for our perusal.

*According to a cost estimate provided by the previous owner in March 2008, a cost estimate of $650,000 or approximately $25.95 per square foot has been submitted as a cost to repair the roof of Building A and convert the western wall to a roll up loading dock. Per agreement and discussion with the client, we have relied on the former owner's representation of the cost estimate and have considered the amount to be a reasonable estimate of cost to cure as of our date of value.*

Building B was built in 1991 and consists of 87,557 square feet. According to the building plans, there are 55,961 square feet on the ground floor and 31,596 square feet on the second floor area. Building B houses the current hotel linen portion of the project as well as the main boiler and waste water recycling plant. The interior is improved with a total approximately 15,015 square feet of improved office area. The building is of concrete tilt-up construction and offers good design and appeal. The building is constructed of concrete tilt up panels and has an exterior height of approximately 33 feet to the top of the parapet. The interior clear height is 26 feet. The exterior glass line is average and adds to the appeal of the building. The windows and entrances are of green aluminum framed glass. The building offers a total of 15 overhead truck doors. The easterly elevation includes three dock high doors. The westerly elevation was designed as the primary staging area. The southern portion of the building is improved with

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 37 of 89

staging for 12 trucks. The dock high loading platform is covered. Two of the doors are located inside the scale room. The north elevation is improved with two smaller docks.

In terms of interior build out, Building B is improved with approximately 15,015 square feet of office area. The office areas are of average quality and condition. The floors are either commercial grade carpeting or vinyl tile. The walls are of metal stud construction with painted gypsum finish. The ceilings are finished with suspended acoustical tile ceilings with recessed fluorescent lighting. The second floor also includes a large employee dining room and lounge area with kitchen cabinetry, a sink and an electric stove. With regards to the production area, this building represents the majority of the hotel linen service area. The floors are concrete slab with vinyl tile coverings and gypsum wall ceilings. The building is served by two 1,000 pound, hydroelectric freight elevators. The 2nd floor area was used as the initial sorting area for soiled laundry. The ground floor is improved for and used for the main laundry operation. This first floor area also hosts the primary shipping and receiving areas as well as the mechanical, boiler and waste water reclamation facility. Assuming that the equipment and conveyor systems can be sold off at auction, the building will represent a shell manufacturing building with an 18% office build-out.

The improvements are similar in average quality and condition. However, there have been some roof leaks over the second floor office area which has stained and collapsed some of the acoustical ceiling tiles. The carpets appear to have some water damage but did not appear to be excessively wet. The computer room was dry and no water damage was noted. Overall, various roof repairs will be needed for this building. The remainder of the building is improved with drop ceilings and vinyl floor production and assembly area. The building is highly improved and could easily be converted for alternative manufacturing and heavy industrial uses.

Building C is a one story, concrete tilt up structure built in 1991. This building contains an aggregate 14,909 square feet with approximately 3,075 square feet or 20.6% office area. The building is currently used as storage and distribution space. The building is made up of concrete tilt up panels of 24 feet and features an interior clear ceiling height of 16 feet. Truck staging is located at the southeast corner of the building and consists of a depressed dock serviced by two roll up truck doors.

The improvements are similar in quality and condition as those found in building B. The entire remainder of the building is improved with drop ceilings and vinyl floor production and assembly area. The building is highly improved and could also easily be converted for alternative use.

*As reported by the receiver and noted during our inspection of the property, Building B has had significant water damage to the interior due to leaking roofs. A cost estimate for a roof repair has not been commissioned but the receiver has estimated approximately $100,000 for roof repairs. Based on Marshall Valuation, coupled with our discussions with Norm Barnes of Barnes Construction, a reasonable estimate of roof repair and patching is approximately $1.00 per square foot. Based on 87,557 square feet in Building B, a cost estimate of approximately $90,000 is deemed reasonable to repair the leaking roofs.*

Based on the above two construction cost estimates, an aggregate cost to cure estimate of $740,000 will be considered to bring the subject to average condition.

## General Data

| Year Built: | Building A: | 1967/1968 |
|---|---|---|
| | Building B: | 1991 |
| | Building C: | 1991 |

| Actual Age | Building A: | 38 years |
|---|---|---|
| | Building B: | 14 years |
| | Building C: | 14 years |

| Effective Age | Building A: | 15+ years |
|---|---|---|
| | Building B: | 15 years |
| | Building C: | 15 years |

## Construction Details

| Foundation: | Concrete slab. |
|---|---|
| Floor Structure: | Concrete slab. |

| Exterior Walls: | Building A: | Wood Frame with Stucco |
|---|---|---|
| | Building B: | Concrete Block |
| | Building C: | Concrete Block |

Fenestration:                    Solid wood doors in the lobby and office area are set in aluminum frames.

Roof Structure:                    Building A:                    Wood deck w/ tar and gravel. However, much of the room was water damaged. The roof will be repaired based on cost estimates noted by the owner.

                                   Buildings B/C:                    Metal deck with tar and gravel. There have been some roof leaks in Building B which have stained several ceiling tiles. Floors and carpet do not appear to be excessively wet or damaged.

## Mechanical Details

Heating and Cooling:                    HVAC provides heat and air conditioning in the office and lobby area. In the shop area, heat is

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 39 of 89

|  | provided by several hanging space heaters and ventilation is provided by roof mounted units. |
|---|---|
| Electricity: | Adequate and typical for occupancy. |
| Fire Protection: | There are fire sprinklers, alarms and class C fire extinguishers located throughout the building. |
| Other: | A waste water treatment facility in Building B. |

**Site Improvements**

| On-site Parking: | There are 174 open marked parking spaces. Based on a gross and net rentable building area of 127,514 square feet, a parking ratio of 1.36 spaces per 1,000 feet of building area is indicated. |
|---|---|
| Landscaping: | There is mature well-maintained landscaping, which consist of trees and shrubbery. |

The subject was designed for use as a commercial laundry facility  A commercial laundry requires additional plumbing, drainage and electrical power which are not needed in most general industrial uses.  The project was intended to be a prototype, with piping in underground trenches (rather than overhead) and with substantial upgrades even for a laundry.  There is a water reclamation and waste treatment system.  While we are not specialists in the laundry industry, it appears to have some design features which are not fully utilized by the existing operator.  For example, Building C was designed to re-pack dust sensitive items for Silicon Valley manufacturing; it has never been used for this purpose.  It also appears that some of the equipment is now quite dated and that the flow of production is not as smooth as it might be if it were to be redesigned today.

Comments:  In summary, the improvements consist of a multi building, wood frame and concrete tilt-up industrial buildings.  The three buildings contain an aggregate 127,514 square feet with an office build-out of 18%.  The buildings are considered to be of average quality with average aesthetic appeal.  The alternative use of the property is as a manufacturing or heavy industrial facility.

Based on our inspection, the physical condition of the improvements appeared to be in average condition.   As noted above, there is roof and structural damage in Building A and a corresponding cost estimate has been provided.  According to a cost estimate provided by the previous owner in March 2008, a cost estimate of $650,000 or approximately $25.95 per square foot has been submitted as a cost to repair the roof and convert the western wall to a roll up loading dock.  Per agreement and discussion with the client, we have relied on the former owner's representation of the cost estimate and have considered the amount to be a reasonable estimate of cost to cure as of our date of value.

As reported by the receiver and noted during our inspection of the property, Building B has had significant water damage to the interior due to leaking roofs.  A cost estimate for a roof repair has not been commissioned but the receiver has estimated approximately $100,000 for roof

repairs. Based on Marshall Valuation, coupled with our discussions with Norm Barnes of Barnes Construction, a reasonable estimate of roof repair and patching is approximately $1.00 per square foot. Based on 87,557 square feet in Building B, a cost estimate of approximately $90,000 is deemed reasonable to repair the leaking roofs.

The building was built in 1984 and is in fair to average condition. With the improvements being constructed in 1984, this indicates a chronological age of 25 years which coincides with its effective age. The economic life of the property is estimated to be 60 years and we conclude to a remaining economic life of 35 years. Functional utility is rated average and economic or external obsolescence does not appear to be a significant factor.


## AMERICANS WITH DISABILITIES ACT

The Americans with Disabilities Act ("ADA") became effective January 26, 1992. The objective of the ADA is to make places that provide the public with goods and services accessible to persons with disabilities. The term "disability" is described very broadly under the "act" as a person with a physical or mental impairment that substantially limits a major life activity, or as a person "regarded as having" such impairment.

The ADA categorizes properties by use, as either commercial facilities or places of public accommodation. Properties are further differentiated, within each of these categories, as new construction, existing facilities, or facilities to which alterations are being made. The ADA regulations apply to all public accommodations, whether they are newly constructed facilities, existing facilities, or existing facilities to which alterations are being made. On the other hand, the regulations apply only to new construction, or altered areas within existing facilities for those properties classified as commercial facilities.

The subject improvements do not appear to be ADA complaint, however, we are not experts in this field; therefore, if this is a concern to the reader, we suggest further investigation is done.


## HIGHEST AND BEST USE

The subject is a site containing 4.61 net acres. The site has good access to local and regional transportation. The site is level, at or above street grade, with all utilities available and septic tanks in place. We have concluded the physical features of the site somewhat limit its development potential because of its long and narrow configuration. Even so, it is similar in configuration to other sites in the area. An industrial project with either one or several buildings could easily fit well on the site's configuration.

The subject property is under the jurisdiction of the County of Santa Clara and the Gilroy Planning Committee. It has zoning designation of CM. Any use at the subject requires a permit and approvals from both the County of Santa Clara and the Gilroy Planning Committee. As described in the Zoning section of this report, there area a large number of potentially allowable uses. According to the County Planning Department, the existing use represents a legal and conforming use as long as all use permits are current.

Market conditions today do not necessarily support a speculative industrial or commercial development. Although a speculative industrial or commercial building is not feasible at this

Case: 09-10007   Doc# 102-2   Filed: 07/23/10   Entered: 07/23/10 20:03:43   Page 41 of 89

time, a build-to-suit or owner-occupied building is still feasible. We believe an owner-user or a build-to-suit development is the highest and best use of the site "as though vacant." The existing improvements contribute value to the site. The highest and best use of the subject "as improved" is with the existing improvements.

Because of current market conditions, the highest and best use for the subject property "as if vacant" would be to hold for future development, or construct an owner-user building.

As noted in the valuation section of this report, the subject's improvements appear to reflect the added contributory value to the property above the land value. Overall, the subject's special purpose (commercial laundry facility) use is considered the highest and best use of the site as long as the demand for such special purpose manufacturing-processing facilities remains. In general, the highest and best use as improved is as a special purpose property, as long as that use remains viable. However, once the demand for commercial laundry services manufacturing facilities substantially decreases it will most likely be financially feasible to demolish and or convert the existing improvements and put them to an alternative use as a manufacturing and heavy industrial facility.

The subject is currently vacant and pursuant to discussions with various commercial laundry users and operators, we conclude that demand for such special purpose use (commercial laundry) is limited under current market conditions. As such, the highest and best use for the subject property, "as improved," is for the present improvements as a manufacturing and heavy industrial project.

# SECTION III—VALUATION

## THE APPRAISAL PROCESS

The estimation of real property's market value involves a systematic process in which the appraisal problem is defined and the data required is gathered, analyzed, and interpreted into an estimate of value. The three traditional approaches to value typically employed in the valuation process are the Cost, Sales Comparison and Income Approaches. The quality and quantity of available data and the relevance of each approach to valuation of the subject property was analyzed to derive a final estimate of value.

Due to the age of the improvements and the difficulty in estimating depreciation, the Cost Approach is not considered necessary to produce credible assignment results. We have therefore omitted the Cost Approach in this analysis. The reader will be presented with two approaches to value, the Sales Comparison and Income Approaches.

The Sales Comparison Approach involves comparison of the subject to similar properties that have recently sold or that are offered for sale. Our research into retail building sales revealed several sales in the marketplace. These sales are reviewed for differences from the subject in the date of sale, location of the site, physical characteristics and other factors. The comparable properties are then adjusted to formulate a value range for the subject property's improvements and the corresponding land area.

The Income Approach involves estimating scheduled gross rental income by comparison with similar properties and estimating expenses (based on historical and/or market experience) to determine net income. This income stream is then capitalized into an indication of value for the subject property.

In providing an opinion of the market rent of the subject property, we have relied on the market rent analysis portion of the Income Approach to value. This approach is based on the premise that the value of an income producing property is represented by the present worth of anticipated income. The appraiser estimates the potential income stream based on the quality, quantity, and duration of the income.

We will first determine the fee simple stabilized market value "upon completion" via the Income and Sales Comparison Approaches. Subsequently, deductions for the cost estimate to repair Building A will be considered to conclude to an "as is" fee simple market value estimate.

## SALES COMPARISON APPROACH

The Sales Comparison Approach is the valuation method, which involves making an analysis of the property being appraised based on recent transactions of similar properties. We have made an investigation of industrial buildings throughout Gilroy, Morgan Hill and the overall Santa Clara County, which are considered to be most relevant to the valuation of the subject property. Of the several considered, we have focused on four or the most recent large building sales, as well as two current listings, as summarized on the following table. We have also included a Building Sales Location Map.

**BUILDING SALES SUMMARY**

| Comp. No. | Location | Bldg Size (S.F.) Year Built | Sale Date | Sale Price | Price/S.F. | NOI/ S.F. | Cap Rate | Comments |
|---|---|---|---|---|---|---|---|---|
| 1 | 5935 Rossi Lane Gilroy | 53,277 1990 | Aug-09 | $2,500,000 | $46.92 | $3.88 | 8.26% | Two story warehouse building built out as approximately 6% office; FAR is 48%; bldg has 3 dock highs and 1 grade level door; on site parking is 1.5/1,000 s.f.; buyer is owner user and Income based on $0.37 ($0.35 to $0.40) psf/mo NNN market rent at time |
| 2 | 21040-21056 Forbes Ave Hayward | 113,160 1982 | Apr-09 | $7,425,000 | $65.62 | $4.71 | 7.17% | One story industrial building built out with 10,000 sf or 8% office; 30' clear height; 4 grade level, 16 dock high doors; on site parking is 1.0/1,000 and FAR is 38%; Bldg is 100% occupied and income based on reported NOI of $532,627. |
| 3 | 16100 Jacqueline Court Morgan Hill | 103,000 1987 | Aug-08 | $7,900,000 | $76.70 | $5.53 | 7.2% | One and two story warehouse building built out as 39% office; clear height in warehouse area is 30'; 2 grade level, 6 dock high doors; on site parking is 2.5/1,000 s.f.; buyer is an owner-user; income based on market rent of $0.50 psf/mo NNN at time of |
| 4 | 16160 Caputo Drive Morgan Hill | 45,033 1982 | Apr-08 | $2,800,000 | $62.18 | $4.91 | 7.90% | Single-story industrial building; 25% office bld out; remaining area is open manufacturing/warehouse space; parking is 1.2/1,000 s.f. Buyer will occupy portion. FAR is 56%. |
| 5 | 18675 Madrone Parkway Morgan Hill | 126,378 2001 | Listing | $11,247,642 | $89.00 | $4.71 | 5.30% | Single-story R&D/manufacturing building; built out as 1% office area; remaining is open warehouse/manufacturing space; FAR is 43%; parking is 2.7/1,000 s.f.; building is 36% occupied; buyer estimates to lease the other space and Income based on $0.45 psf per month NNN market rent at time of sale. |
| 6 | 165-198 East 9th Street Gilroy | 70,525 1977/1982 | Listing | $5,200,000 | $73.73 | $4.42 | 6.00% | Two single-story industrial buildings on separate parcels; FAR is 49%; on-site parking is 0.6/1000; shared loading dock; 4% office build-out. |
| **Subject** | 8190 Murray Avenue Gilroy APN: 841-59-022 | 127,514 1984 | - - - | - - - | - - - | $4.19 | - - - | One-story CTU industrial building; 18% office;  1.7/1,000 pkg, 32' clear ht and 12 dock high doors.  Building is situated on a 200,812 sf site indicating an FAR of 63% |



Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 46
of 89

| BUILDING SALE ADJUSTMENT GRID | | | | | | |
|---|---|---|---|---|---|---|
| COMPARABLE SALES | 1 | 2 | 3 | 4 | 5 | 6 |
| DATE OF SALE | Aug-09 | Apr-09 | Aug-08 | Apr-08 | Listing | Listing |
| SALE PRICE | $2,500,000 | $7,425,000 | $7,900,000 | $2,800,000 | $11,247,642 | $5,200,000 |
| BUILDING SIZE (SQ FT) | 53,277 | 113,160 | 103,000 | 45,033 | 126,378 | 70,525 |
| AGE | 1990 | 1982 | 1987 | 1982 | 2001 | 1977/1982 |
| NOI/SQ | $3.88 | $4.71 | $5.53 | $4.91 | $4.71 | $4.42 |
| PRICE/SQ FT | $46.92 | $65.62 | $76.70 | $62.18 | $89.00 | $73.73 |
| ADJUSTMENTS | | | | | | |
| Financing | $0 | $0 | $0 | $0 | $0 | $0 |
| Conditions of Sale | $0 | $0 | $0 | $0 | ($2,249,528) | ($1,040,000) |
| NORMAL SALE PRICE | $2,500,000 | $7,425,000 | $7,900,000 | $2,800,000 | $8,998,114 | $4,160,000 |
| TIME ADJUSTMENT | | | | | | |
| Months Difference | 2 | 6 | 14 | 18 | 0 | 0 |
| Total Adjustment | 0.0% | 0.0% | -15.0% | -15.0% | 0.0% | 0.0% |
| Dollar Adjustment | $0 | $0 | -$1,185,000 | -$420,000 | $0 | $0 |
| TIME ADJ PRICE | $2,500,000 | $7,425,000 | $6,715,000 | $2,380,000 | $8,998,114 | $4,160,000 |
| LOCATION/ACCESS | 0.0% | -20.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| SIZE/UTILITY | -10.0% | 0.0% | 0.0% | -10.0% | 0.0% | -7.5% |
| QUALITY | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| AGE/CONDITION | 0.0% | 0.0% | 0.0% | 0.0% | -10.0% | 0.0% |
| OFFICE BLD OUT/TI ALLOW | 10.0% | 6.0% | -11.0% | -5.0% | 8.0% | 6.0% |
| UTILITY | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| PARKING/FAR | 0.0% | 0.0% | 0.0% | 0.0% | -5.0% | 5.0% |
| POTENTIAL INCOME | 3.8% | -6.2% | -16.0% | -8.6% | -6.2% | -2.8% |
| TOTAL % ADJUSTMENT | 3.8% | -20.2% | -27.0% | -23.6% | -13.3% | 0.7% |
| | $93,750 | ($1,497,050) | ($1,811,185) | ($561,909) | ($1,192,250) | $30,044 |
| INDICATED VALUE | $2,593,750 | $5,927,950 | $4,903,815 | $1,818,091 | $7,805,864 | $4,190,044 |
| INDICATED PRICE/SQ FT | $48.68 | $52.39 | $47.61 | $40.37 | $61.77 | $59.41 |
| VILLANUEVA REALTY ADVISORS | | | | | | |

The comparables range in size from 45,033 to 126,378 square feet. Before adjustment to the subject, they indicate a unit value from $46.92 to $89.00 per rentable square foot. The annual net operating income per square foot of the comparables ranges from $3.88 to $5.53. As will be shown in the Income Approach later in this report, the subject's projected net operating income is $4.19 per square foot, which is well bracketed by the range indicated by the comparables. The appraiser must make adjustments to each comparable to account for dissimilarities between the individual sales and the subject property. Although this approach relies on past sales, it provides direct evidence of actions of both buyers and sellers.

With the exception of Comparables 5 and 6, the sales are all arms-length transactions and no adjustments for financing were noted. Moreover, no adjustments for conditions of sale are noted. Comparables 5 and 6 are current listings. As such, we have provided a downward adjustment for condition of sale to reflect its current listing status. We spoke with various brokers including Mr. Mark Sanchez and MR. Brent Dressen, both of Colliers International. They noted that a downward adjustment of 10% to 20% is typically considered to account for the variance between listing and executed sale. However, because of the limited activity in the

marketplace, coupled with the continued weakening of the economy, a much larger downward adjustment of 20%, at the upper end of the range, is reasonable. We have relied on their estimate and have adjusted these two comparables downward.

The comparables sold from April 2008 through August 2009. As noted in the Market Overview section of this report, demand for industrial buildings and owner-user properties have been declining. Values for industrial buildings such as the subject have decreased approximately 5% to 10% over the past six months to a year and approximately 10% to 20% over the past two years. In discussion with various market participants, a downward adjustment of 15% has been applied to Comparables 3 and 4 and no adjustments have been applied to Comparables 1, 2, 5 and 6.

With the exception of Comparable 2, all of the sales are located in the Gilroy/Morgan Hill industrial market and feature similar locational characteristics as the subject, meriting no locational adjustments. Comparable 2 is located in Hayward which is considered to be a superior market due to its proximity to superior demand and employment generators. Overall, a downward adjustment for location is warranted for Comparable 2.

Smaller buildings typically sell for a higher price per square foot, all else being equal. With the exception of Comparables 1, 4 and 6, each of the sales feature relatively similar sized buildings and no adjustments for size are merited. Comparables 1, 4 and 6 feature much smaller buildings and downward adjustments for size and the relevant economies of scale are merited.

Each of the comparables features similar quality and overall appeal. With regards to age/condition, excluding Comparables 5, no adjustments were needed as the comparables represent relatively similar age/condition as the subject. Downward adjustments are merited for Comparable 5 which represents a much newer improvement.

In confirming market rents, each of the comparables required adjustments for office build out. Upward adjustments are provided for buildings with smaller office build-outs and downward adjustments are merited for buildings with superior office build-outs. Tenant improvements are based on a standard $40 per square foot office build-out.

According to various brokers active in the manufacturing and special use properties within Santa Clara County, special use buildings such as the subject merit adjustments for the amount of truck doors and distribution capacity incorporated into the facility. All of the comparables feature similar utility as an industrial manufacturing or warehouse facility and no utility adjustments are warranted.

Regarding parking/FAR, excluding Comparables 5 and 6, all of the properties feature relative similar site coverage and merit no adjustments. Comparable 5 features a superior parking ratio and a downward adjustment is warranted. Comparable 6 features an inferior parking ratio and conversely, merits an upward adjustment for FAR/parking. Lastly, adjustments are merited for differences in income potential.

After adjusting the comparables for various differences with the subject, a unit price range from $40.37 to $61.77 per square foot is indicated for the subject. An average price per square foot of

Case: 09-10007   Doc# 102-2   Filed: 07/23/10   Entered: 07/23/10 20:03:43   Page 48 of 89

$51.71 is also indicated. We put the most weight on Sales 1 and 2 as they represent the most recent sale activity and to Sale 1 as the most proximate o the subject.

Based on the above-mentioned analysis, we have concluded a unit value of $50.00 per square foot to be appropriate for the subject property. This yields a value estimated by the Sales Comparison Approach, calculated as follows:

| | | |
|---|---|---|
| **127,514 s.f.  x $50.00/s.f.  =** | | **$6,375,700** |
| **Rounded To** | | **$6,380,000** |

## INCOME APPROACH

The Income Approach is based on the premise that the value of an income-producing property is represented by the present worth of anticipated income. The appraiser estimates the potential income stream based on the quality, quantity, and duration of the income stream. The potential income is then capitalized to arrive at a value for the subject property.

The valuation technique presented within this approach is direct capitalization. This technique projects stabilized net operating income and capitalizes that income into perpetuity by the application of a single overall capitalization rate derived from market sales. Direct capitalization makes no specific allowances for fluctuations of net income over the holding period nor does it make specific allowances for appreciation. Rather, both considerations are reflected implicitly in the application of a single overall capitalization rate.

### Subject Leases

The subject was constructed for use as a commercial laundry facility. At present, the buildings are 100% vacant as the former occupant, West Coast Linen, has filed for bankruptcy and the receiver has shut down operations. Although there is limited interest from smaller commercial laundry operators, no operator or tenant has approached the lender to start up leased operations of the commercial laundry facility.

### Market Rent Survey

In order to estimate the current market rent for the subject property, a survey was made for recent industrial leases in the South County area. There has been very limited leasing activity, particularly in the size range from over 50,000 square feet in the Gilroy and Morgan Hill market. Due to a lack of recent executed leases in the South County area we have expanded our scope to include slightly smaller spaces down to approximately 30,000 square feet. We have selected five executed leases and three current listings as the most relevant comparables and have presented them on the following page.

Before adjustment to the subject, the comparables indicate a rental range of $0.30 to $0.57 per square foot per month on a "triple net" lease basis.

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 49
of 89

**BUILDING RENT SURVEY**

| Rental No. | Location | Description | Suite Size (S.F.) | Lease Date | Rent/S.F. Per Mo. NNN | TIs/ S.F. | Comments |
|---|---|---|---|---|---|---|---|
| 1 | 8333 Swanston Lane Gilroy | 36,399 s.f. industrial Blt 1972/2008 | 36,399 | Jun-09 | $0.57 | As Is | **Germains Technology** Single-tenant metal industrial building; 5 year lease with annual 2% increases; 14% office; 1 grade-level, 12 dock high doors; 2.0/1,000 sf parking; 38% FAR. NNN = $0.17 |
| 2 | 198 East 9th Street Gilroy | 39,600 s.f. industrial Blt 1982 | 39,600 | Jan-09 | $0.40 | As Is | **Thomas Kinkade Co.** Single-tenant industrial building; lease extension for 1 year, flat rent. 3% office; 3.0/1,000 sf parking. |
| 3a | 6205 Engle Way Gilroy | 162,155 s.f. industrial Blt 1980s | 29,701 | Oct-08 | $0.42 | As-is | **Confidential** Industrial building with adjoining suites; 1% office; 3 year lease; 4% annual increases; Bldg has 5 dock high doors; 24 foot clear height and parking is 2.0/1,000 sf. NNN=$0.08. |
| 3b | | Suites A-D | 59,520 | Listing | 0.37 | TBD | **Listing** Industrial building with adjoining suites; appx 3% office; 2 to 5 year lease; 2% annual increases; Bldg has 11 dock high and 3 grade level doors; 24 foot clear height and parking is 2.0/1,000 sf. |
| 4. | 500 Luchessa Gilroy | 160,000 s.f. industrial Blt 1980 | 160,000 | Dec-07 | $0.40 | As-Is | **5 Day Furniture** 3 year term; on site parking is 1/1,000 s.f. there is a small 5% office; building in average condition; on site parking is 1/1,000 |
| 5. | 8311 Central Avenue Newark | 194,033 s.f. industrial Blt. 1986 | 194,033 | Jul-08 | $0.47 | $3.00 | **Amcor Sunclipse.** Ind bldg converted to manufacturing; 149 mo. term includes 5 months free and stepped increases of appx 2.8% per year; heavy power; 12.9% office; 1 drive in and 20 dock high doors; parking is 0.76/1000. NNN is $0.11 psf. |
| 6 | 555 Mayock Road Gilroy | 51,646 s.f. industrial Blt 1968 | 51,646 | Listing | $0.30 | As-Is | **Listing** Industrial warehouse; 5,165 sf office or 10% office; 20' Clear height; 2 grade level doors, 2.0/1,000 s.f. parking. Some yard space. |
| 7 | Part of Madrone B.P. 18675 Madrone Pkwy, Ste F Morgan Hill | 126,378 s.f. industrial Blt 2001 | 46,970 | Listing | $0.39 | As Is | **Listing** Multi-tenant concrete tilt-up warehouse building; 26% office; 28' clear height; 2 grade-level, 4 dock high doors; 2.4/1,000 sf parking. NNN = $0.18 |
| Subj | Former West Coast Linen 8190 Murray Avenue Gilroy | 127,514 s.f. industrial Blt 1984 | 127,514 | | | | **Listing** One-story CTU industrial building; 18% office; 1.7/1,000 pkg, 32' clear ht and 12 dock high doors. Building is situated on a 200,812 sf site indicating an FAR of 63%. |

Gross = tenant is responsible for utilities and janitorial
NNN = Triple Net; Tenant is responsible for all operating expenses.

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 50 of 89



**BUILDING RENTAL ADJUSTMENT GRID**

| COMPARABLE RENTAL | 1 | 2 | 3a | 3b | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| DATE OF LEASE | Jun-09 | Jan-09 | Oct-08 | Listing | Dec-07 | Jul-08 | Listing | Listing |
| UNIT SQ. FT. | 36,399 | 39,600 | 29,701 | 59,520 | 160,000 | 194,033 | 51,646 | 46,970 |
| BUILDING AGE | Blt 1972/2008 | Blt 1982 | Blt 1980s | Blt 1980s | Blt 1980 | Blt. 1986 | Blt 1968 | Blt 2001 |
| TERM (MONTHS) | 60 | 12 | 36 | Neg | 36 | 149 | Neg | Neg |
| LEASE RATE/SF/MO NNN | $0.57 | $0.40 | $0.42 | $0.37 | $0.40 | $0.47 | $0.30 | $0.39 |
| | | | | | | | | |
| TIME ELAPSED | 4 | 9 | 12 | 0 | 22 | 15 | 0 | 0 |
| TIME ADJUSTMENT | 0.0% | -7.5% | -10.0% | 0.0% | -15.0% | -12.5% | 0.0% | 0.0% |
| TIME ADJUSTED RENT | $0.57 | $0.37 | $0.38 | $0.37 | $0.34 | $0.41 | $0.30 | $0.39 |
| | | | | | | | | |
| ADJUSTMENTS | | | | | | | | |
| LOCATION | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -10.0% | 0.0% | 0.0% |
| QUALITY/APPEAL | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| SIZE | -15.0% | -15.0% | -15.0% | -10.0% | 0.0% | 5.0% | -10.0% | -10.0% |
| AGE/CONDITION | -15.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 10.0% | -10.0% |
| OFFICE BLD OUT/TI | 3.0% | 16.0% | 18.0% | 16.0% | 15.0% | 5.0% | 8.0% | -6.0% |
| UTILITY | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| TERM | 0.0% | 5.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| CONCESSIONS | 0.0% | 0.0% | 0.0% | -10.0% | 0.0% | 3.4% | -10.0% | -10.0% |
| PARKING/SITE COV | 0.0% | -5.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | | | | | | | | |
| TOTAL % ADJUSTMENT | -27.0% | 1.0% | 3.0% | -4.0% | 15.0% | 3.4% | -2.0% | -36.0% |
| TOTAL $ ADJUSTMENT | ($0.15) | $0.00 | $0.01 | ($0.01) | $0.05 | $0.01 | ($0.01) | ($0.14) |
| INDICATED LEASE RATE PER SQUARE FOOT "NNN" | $0.42 | $0.37 | $0.39 | $0.36 | $0.39 | $0.43 | $0.29 | $0.25 |

**VILLANUEVA REALTY ADVISORS**

Case: 09-10007   Doc# 102-2   Filed: 07/23/10   Entered: 07/23/10 20:03:43   Page 52 of 89

Leases for industrial buildings are typically written on a "triple net," (NNN) basis. In a triple net lease, the lessor is generally responsible only for vacancy and collection loss, management and replacement reserves, while the tenant pays for utilities, property taxes, insurance, and maintenance. We will present our discussion on a NNN basis since this appears to be typical of the market area for single tenant industrial properties.

Rental rates have declined slightly over the past six months, however, there has been such limited amount of activity and we are unable to truly ascertain any supportable adjustment for time. Our discussions with various market participants reveal that market rent has declined approximately 5% to 10% over the past six months to a year and have had a more pronounced decline of 10 to 20% over the past two years. A downward adjustment for the Comparable, 2, 3a, 4 and 5 are merited.

In terms of location, with the exception of Comparable 5, the comparables featured relatively similar locations within Gilroy and Morgan Hill and no locational adjustments were merited. Comparable 5 is located in Newark which is considered superior due to its proximity to demand and employment generators and a downward adjustment for location is merited.

None of the comparables required adjustments for quality and appeal.

With the exception of Comparable 4, each of the comparables featured differing sizes and merit adjustments for economies of scale. Comparables 1, 2, 3a, 3b and 6 featured much smaller unit sizes and merit downward adjustments for size. Comparable 4 featured a relatively similar size and merit no adjustment for size. Comparable 5 featured a much larger size and merit an upward adjustment for size.

With the exception of Comparables 1, 6 and 7, each of the sales featured similar age/conditions as the subject and merits no adjustments. Comparable 1 and 7 are newer facilities and downward adjustments for superior age/condition is merited. Comparable 6 is a much older facility and an upward adjustment is merited.

We have taken into consideration the subject's build out as 18% finished office, the subject's location, and other physical characteristics and current market conditions in order to determine the appropriate market rent for the subject property. We have considered adjustments for office build-out as necessary.

With regards to lease term, Comparable 2 merits an upward adjustment attributable to its short (1 year) lease term. The remaining comparables exhibit typical lease terms and no further adjustments are merited.

In terms of concessions, only Comparable 5 was given free rent. We have adjusted this comparable to account for its free rent. In terms of other concessions, we also note that Comparables 3b, 6 and 7 are current listings. We have adjusted these comparables downward for their current listing status.

Lastly, adjustments for FAR/parking are warranted. With the exception of Comparable 2, the comparables feature similar FAR/parking as the subject. Comparable 2 has a superior parking ratio and merits a downward adjustment for FAR/parking.

Subsequent to adjustments, the comparables feature a rental rate parameter ranging from $0.25 to $0.43 per square foot per month, triple net with an average of $0.38 per square foot per month, triple net.  Based on the adjustments above, with most emphasis on Comparables 2, 3a and 5 as they represent the leases with the least net adjustments and to Comparables 1, 2 and 3 as they represent the most recent leases in the Gilroy market area, the best indication of market rent is $0.40 per square foot, triple net.

**Potential Gross Income**
Based on market rents, potential gross rental income is calculated as follows:

**127,514 square feet        x        $0.40/s.f./month        x        12 months        =        $612,067**

**Vacancy and collection loss** includes lost rent between tenants and potential collection loss from existing tenants.  As previously mentioned in the Market Overview section of this report, within the Morgan Hill/Gilroy submarket, in the past 12 months vacancy for warehouse space decreased to 5.3% while vacancy for manufacturing space increased to 26.2%.  We have estimated long-term vacancy and collection loss for typical manufacturing and industrial uses at 10% of the potential gross income.  This vacancy rate is consistent with the long term stabilized vacancy rate reported by various brokers and market participants active in the Gilroy/Morgan Hill market area.

The tenant is on a "triple net" expense arrangement, where the tenant is responsible for all operating expenses, including taxes, insurance, utilities, and janitorial.

**Management** for single-tenant buildings typically runs between 1.0 and 3.0% of effective gross income for properties of this type.  Because the building would be leased to a single-tenant, we are estimating management fees at the lower end of the range, at 2.0%.

**Reserves** for replacement depend on the age and condition of the property and how well the buildings have been maintained in the past.  The better the condition the property is in, the less need for replacement of building components, particularly in the near-term.  Likewise, if the building has not been maintained properly in the past, it may need some major expenditure in the near future.  Reserves for replacement generally range between 1 and 2% of effective income for buildings of this type.  We have estimated the reserves necessary for replacement at 1.0%.

**Net Income Estimate**
Subtracting total expenses from gross income yields an annual fee simple net operating income estimate for the property of $534,335 or $4.19 per square foot.

**Capitalization Rate Analysis**
The next step is to process the projected net income into a value estimate.  This is accomplished by determining an appropriate capitalization rate for the subject property.  A capitalization rate is the ratio of net income per sale price (i.e., rate = net income ÷ sale price).  Once a rate is selected for the subject and the net income projected, the same formula can be used to estimate a market value.  The capitalization rate can be extracted from market sales if the net income is known or can reasonably be estimated at time of sale.

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 54 of 89

Capitalization rates have been very low over the past two years due to the fact that interest rates are currently very low and investors are finding real estate investments attractive because the stock market is considered unstable.  There are very few investment properties available for sale, and when they come on line, there have been multiple offers.  Demand for owner-user buildings has been very good, also because of interest rates, and this has put downward pressure on capitalization rates as well, because owner-users are typically willing to buy properties at lower capitalization rates.

However, consistent with the tightening of financing and the on-going credit crunch, overall capitalization rates are continuing to increase as financial and liquidity risk increases in the marketplace.  RERC shows capitalization rates for industrial properties in the range of 7.0% to 10.0% with an average of 8.7% while capitalization rates for warehouse properties range from 6.8% to 12.0% with an average of 8.4%.

The discount rate appropriate to the subject, as a small investment, heavily weighted toward owner-occupancy, would be expected to be lower.  The capitalization rates indicated by the comparable sales previously discussed in the Sales Comparison Approach section of this report are summarized below:

| Sale No. | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Cap Rate:  (%) | 8.26 | 7.17 | 7.20 | 7.90 | 5.30 | 6.00 |
| Sale Date | 8/09 | 4/09 | 8/08 | 4/08 | Listing | Listing |

The executed sales present a relatively tight range from 7.17% to 8.26%.  In general capitalization rates for industrial properties like the subject in the area have ranged from the 7 to 8.5% range over the past two years.  There have been very few sales, therefore it makes estimating the appropriate capitalization rate more difficult.  There is a general consensus among real estate professionals and investors, that capitalization rates have increased by 50 to 100 basis points, if not more over the past two years and from 25 to 50 basis points within the past year.  Even with the lack of sales, this is what investors would demand today to purchase a property.

We have taken into consideration the capitalization rates above and the opinions of real estate professionals familiar with the area and the subject property.  While it is difficult to estimate the appropriate capitalization rate based on comparables in today's market, the consensus of the real estate professionals we interviewed stated they thought a capitalization rate for the subject, if it were leased at market to be in the 8.5% range.

After considering market conditions, the opinions of real estate professionals and the other physical characteristics, we have concluded a capitalization rate above the range indicated by the comparables at 8.50%.

After considering all the above factors, we have concluded a capitalization rate at 8.50% to be appropriate for the subject property as an industrial manufacturing facility.

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 55
of 89

### INCOME APPROACH SUMMARY

**Potential Gross Income**

| | | | |
|---|---|---|---|
| Rental Income | 127,514 SF  x      $0.40   psf/mo  x  12  = | | $612,067 |
| **Less Vacancy & Collection Loss**    10.0% | | | (61,207) |
| **Effective Gross Income (EGI)** | | | $550,860 |

**Less Expenses:**

| | |
|---|---|
| Unreimb Management (2.0% of EGI) | (11,017) |
| Reserves (1.0% of EGI) | (5,509) |
| Total Expenses | ($16,526) |

| | |
|---|---|
| **Net Operating Income** | $534,335 |
| Divided by Capitalization Rate | 8.50% |
| **Market Value Upon Completion** | $6,286,290 |
| **Rounded To:** | **$6,290,000** |

**VILLANUEVA REALTY ADVISORS**

As indicated in the Income Approach Summary, the fee simple stabilized market value upon completion is estimated at $6,290,000.


## RECONCILIATION OF VALUE INDICATIONS

The subject property has been analyzed using two of the typical three approaches to value:  the "Sales Comparison Approach" and the "Income Approach."  The value indications given by each approach are summarized as follows:

| | |
|---|---|
| **Sales Comparison Approach** | **$6,380,000** |
| **Income Approach** | **$6,290,000** |

In reaching a final estimate of value we evaluated the reliability of each value indication based upon the quantity and quality of the available data and the applicability of the assumptions underlying each approach.

The cost approach has not been applied as investors and owner-users generally do not make investment decisions based upon the Cost Approach and it does not necessarily represent the actions of buyers and sellers in the market. Overall, given the size of the project and specialized use of the improvements e.g. commercial laundry processing and manufacturing facility the value via the cost approach is considered reflective of a value in use to specific user, not an indicator of market value.

The sales comparison approach enables us to bracket the subject's value characteristics, despite minor differences between the comparables cited.  Properties with the subject's characteristics and size are primarily purchased by owner-users.  The sales comparison approach involves the direct comparison of the property being appraised with similar properties that have recently sold

in the same or similar market areas. It is heavily dependent upon the accuracy and comparability of the sales comparables. As stated a search over the past five years of the entire State of California was conducted for commercial laundry manufacturing facilities and no comparable sales were uncovered. The market for these type facilities is considered extremely specialized due to the location, configuration, layout and design of the improvements. In the sales analysis we focused on sales of larger manufacturing or industrial/warehouse buildings throughout the region and were able to uncover several sale comparables. The comparable sales uncovered were considered fairly representative of buyers' expectations and price per square foot currently being obtained within the subject's immediate market area. Each sale was analyzed and compared on a price per square foot basis. Based upon the available market data, coupled with the age/condition of the subject property, this approach was considered a good indicator of value. Thus, in arriving at a final estimate of value for the subject, we have given supporting consideration to the sales comparison approach, because the buildings can be of interest to an owner-user or investor.

The income capitalization approach generally gives a reliable indication of value for income-producing properties purchased primarily by investors, when there is adequate information on project economics. The income approach has utilized market rents for the subject. It also has reasonable support of market capitalization rates. In addition, this method is widely used and understood by investors in the marketplace, giving it additional importance. The Income Approach is also considered reliable as investors and owner-users generally consider this approach as their primary valuation methodology. However, given the difficulty in accurately estimating capitalization rates given the current weak market conditions and various liquidity issues, this approach was given equal consideration in our final value conclusion.

Based on the market data presented, it is our opinion that the "as is" "market value" of the fee simple interest in the subject property, as of October 7, 2009 and predicated on an exposure period of twelve months, is $6,300,000.

## STATEMENT OF STABILIZED UPON COMPLETION

Based upon our research and analysis, predicated on an exposure time of twelve months, the estimated "stabilized upon completion" market value of the fee simple interest in the subject property as of October 7, 2009, is:

**SIX MILLION THREE HUNDRED THOUSAND DOLLARS**
**($6,300,000)**

## AS IS MARKET VALUE

Our appraisal assignment is to determine the "AS IS" market value in the subject property. As previously mentioned, a cost estimate of $740,000 has been submitted by the owner as an estimate to repair the water damaged roof and to convert the west wall of Building A into a wall with a roll up door and a loading dock as well as the additional cost of repairing the roof leaks in Building B. Per agreement and discussion with the client, we have relied on the former owner's representation of the cost estimate and have considered the amount to be a reasonable estimate of cost to cure as of our date of value.

Deducting this cost amount from the above "as if stabilized upon completion" market value estimate, we can conclude to an As Is market value estimate.

| INCOME APPROACH SUMMARY | |
| --- | --- |
| **Stabilized Market Value Upon Completion** | $6,300,000 |
| **less Construction Cost** | **($740,000)** |
| **As Is Leased Fee Market Value** | **$5,560,000** |
| **VILLANUEVA REALTY ADVISORS** | |

**STATEMENT OF AS IS MARKET VALUE**

Based upon our research and analysis, predicated on an exposure time of twelve months, the estimated "as is" market value of the fee simple interest in the subject property as of October 7, 2009, is:

**FIVE MILLION FIVE HUNDRED SIXTY THOUSAND DOLLARS**

**($5,560,000)**

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 58 of 89

# A D D E N D U M

Case: 09-10007      Doc# 102-2      Filed: 07/23/10    Entered: 07/23/10 20:03:43      Page 59 of 89

# PHOTOGRAPHS OF THE SUBJECT PROPERTY



Subject property facing east



Building A facing east

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 61 of 89



Building B facing east -  truck and water treatment building



Building B – Main Building

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 62
of 89



Roadway separating Building B and Building C



Building C facing north

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 63 of 89



Building A interior



Building A roof requiring repair

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 64
of 89



Building A facing south. West wall (supported) to be converted to loading dock/roll up



Building A facing west

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 65 of 89



Building B facing east along northern perimeter



Building B facing south along eastern perimeter

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 66 of 89



Building B loading Docks



Building B Water Treatment equipment



Main Laundry Floor



Sheet press and main laundry floor (taken on March 2008)

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 68
of 89



Receiving Laundry area (taken on March 2008)



2nd floor Conference Room



Conference Room damaged Ceiling tiles



Office hallways with ceiling stains and carpet stains



Stained carpet slightly damp from water damage



Freight Elevators from Receiving

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 71
of 89



Storage and Equipment Rooms in Building B



Facing north - Building C Loading Dock

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 72
of 89



Building C Interior



Building C office area

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 73
of 89



Murray Avenue facing north



Murray Avenue facing south

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 74
of 89

# PHOTOGRAPHS OF COMPARABLE RENTALS

Case: 09-10007      Doc# 102-2      Filed: 07/23/10      Entered: 07/23/10 20:03:43      Page 75
of 89



Rent Comparable 1 – 8333 Swanston Lane, Gilroy



Rent Comparable 2 – 198 East 9th Street

Case: 09-10007     Doc# 102-2     Filed: 07/23/10     Entered: 07/23/10 20:03:43     Page 76
of 89



Rent Comparable 3          6205 Engle Way, Gilroy



Rent Comparable 4          500 Luchessa, Gilroy



Rent Comparable 5                    8311 Central Avenue, Newark



Rent Comparable 6                    555 Mayock Road, Gilroy

Case: 09-10007      Doc# 102-2      Filed: 07/23/10      Entered: 07/23/10 20:03:43      Page 78
of 89



Rent Comparable 7            18675 Madrone Parkway, Morgan Hill

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 79 of 89

# PHOTOGRAPHS OF COMPARABLE SALES

Case: 09-10007     Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43     Page 80
of 89



Building Sale 1                    5935 Rossi Lane, Gilroy



Building Sale 2                    21040-21056 Forbes Ave, Hayward

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 81 of 89



Building Sale 3                    16100 Jacqueline Court, Morgan Hill



Building Sale 4                    16160 Caputo Drive, Morgan Hill

Case: 09-10007    Doc# 102-2    Filed: 07/23/10    Entered: 07/23/10 20:03:43    Page 82
of 89



Building Sale 5                    18675 Madrone Parkway, Morgan Hill



Building Sale 6                    165-198 East 9th Street, Gilroy

# QUALIFICATIONS OF GUIDO M. VILLANUEVA
# ASSUMPTIONS AND LIMITING CONDITIONS
# CERTIFICATION OF APPRAISAL

# GUIDO M. VILLANUEVA
## *QUALIFICATION STATEMENT*

### EXPERIENCE
Brokerage, Development and Consulting with Villanueva Realty Advisors (1997-present).
Regional Manager, Coast Federal Bank Income Property Appraisal Group, (1994-1997)
Senior Appraiser, Bank of America/Security Pacific Bank (1991-1994)
Fee Appraiser, Urban Land Research and Smith Denton Associates (1988-1991)
Analyst, Bank of America Investment Real Estate (1986-1988)


### EDUCATION
Bachelor of Arts Degree Mathematics from UC Berkeley

Successfully completed the following Appraisal Institute courses: Real Estate Principles, Basic Valuation, Capitalization Theory (Parts A & B), Valuation Analysis and Standards of Professional Practice (Parts A and B).

Successfully completed the following Department of Real Estate courses: Real Estate Law, Real Estate Finance, Real Estate Ethics, Real Estate Principles


### PROFESSIONAL LICENSE
- State of California "Certified-General" Appraiser Certificate No. AG0010546
- State of California Real Estate Broker License No. 1207079


### APPRAISAL ASSIGNMENTS
Some of the types of real estate appraisal assignments are outlined below:

| | |
|---|---|
| Commercial: | Retail shopping centers, medical and professional office buildings, vacant land. |
| Industrial: | Warehouses, manufacturing, R&D, biotech, lumberyards, vacant land. |
| Residential: | Apartments, condominium development, vacant land. |
| Special Purpose: | Athletic clubs, hospitals, medical clinics, nursing homes, marinas, motels. |
| Other: | Minority interest valuation, condemnation, litigation support, easement arbitrations and review appraisals. |

VILLANUEVA REALTY ADVISORS

### QUALIFICATION STATEMENT, GUIDO M. VILLANUEVA - Continued

### CORPORATE AFFILIATIONS

As a brokerage and land development company, Villanueva Realty Advisors has been a corporate partner of a few development, brokerage companies and individuals. A partial list of past affiliations includes:

Barnes Development                  Pacific Integrity Mortgage (Diablo Funding)
Oxford Financial Group              Pacific Realequities

### CLIENTS

Clients of Villanueva Realty Advisors include banks, savings and loans, insurance companies, attorneys, public agencies and individuals. A partial list of past clients includes:

Arcadia Development                  Glenborough Investments
Bank of America                      Lincoln Property Co.
Bank of the West                     Lodgeworks – Summerfield Suites
Cendant Corporation                  Luther Burbank Federal Bank
City of Fremont                      Marriott International
City of Milpitas                     Mid Peninsula Bank
City of San Jose                     Pannatoni Development
City National Bank                   Santa Clara County Redevelopment Agency
Comerica Bank-California             Sanwa Bank
County of Santa Clara                Sutter Health Hospitals
Essex Development                    U.S. Bancorp
Equinox Hospitality                  Walton Street Capital
Gassett, Perry and Frank Attorneys at Law    Wells Fargo Bank

## ASSUMPTIONS AND LIMITING CONDITIONS

**The appraisal is subject to the following assumptions and limiting conditions:**

We believe the information furnished by others in this report to be reliable, but we assume no responsibility for its accuracy.

The legal description furnished us is assumed to be correct. We assume no responsibility for matters legal in character nor do we render any opinion as to the title, which is assumed to be good. All existing liens and encumbrances have been disregarded and the property is appraised as though free and clear under responsible ownership and competent management.

We have made no survey of the property and assume no responsibility in connection with such matters. The sketch in this report is included to assist the reader to visualize the property. Stable soil conditions are assumed. Water and mineral rights have not been valued, unless noted.

If this appraisal contains a valuation relating to a portion of a larger parcel of real estate, the value reported for such portion relates to the portion only. It should not be construed as applying with equal validity to other portions of the larger parcel.

Any structure(s) is assumed by the appraiser to have been constructed in accordance with applicable building code requirements. Any use of the structure(s) is assumed to be in conformance with applicable zoning ordinances, unless otherwise noted in the appraisal. No specific investigation of these issues has been undertaken by the appraiser. It is recommended that the client secure appropriate legal opinions if these issues pose any concern.

The Americans with Disabilities Act ("ADA") became effective January 26, 1992. The appraisers have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the property. Since the appraisers have no direct evidence relating to this issue, possible noncompliance with the requirements of ADA in estimating the value of the property has not been considered.

Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

VILLANUEVA REALTY ADVISORS

**Assumptions and Limiting Conditions** - (Continued)

This appraisal shall be used only for the function outlined in the attached report, unless expressly authorized by Villanueva Realty Advisors. The format and value reported may or may not be valid for other purposes.

Distribution of this report is at the sole discretion of the client and we will make no distribution without the specific direction of the client.

If the client provides copies of this report to third parties, the client shall ensure that the report is copied in its entirety.

The liability of Villanueva Realty Advisors., and its employees, is limited to the client only and to the fee actually received by the appraiser (total per appraisal). Further, Villanueva Realty Advisors assumes no obligation, liability, or accountability to any third party. Client agrees to hold Villanueva Realty Advisors, and its employees, harmless in the event of lawsuit brought by any other party. If this report is placed in the hands of anyone but the client, client shall make such party aware of all the assumptions and limiting conditions of the assignment. The appraiser is in no way responsible for costs incurred to discover or correct any deficiencies of any type present in the property, physically, financially, and/or legally. The client also agrees that in case of lawsuit arising from or in any way involving this appraisal assignment (brought by lender, partner or part owner in any form of ownership, tenancy or any other party), client will hold appraisers harmless from and against any liability, loss, cost or expense incurred or suffered by appraiser in such action, regardless of its outcome.

The appraisers cannot be held responsible for unforeseeable events that alter market conditions prior to the effective date of any prospective value.

This is a Summary Appraisal Report which is intended to comply with the reporting requirements set forth under Standard Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. As such, it presents only summary discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated below. The appraiser is not responsible for unauthorized use of this report.

We have made a physical inspection of the property and have noted no visible physical defects in our report. Although generally familiar with real estate, we are not architects or structural engineers who would have detailed knowledge of building design and structural integrity. Accordingly, no opinion is given regarding the structural integrity of the property, including its conformity to specific governmental code requirements (e.g., fire, building and safety, earthquake, and occupancy), or any physical defects, which were not readily apparent to the appraiser during the inspection.

The value or values presented in this report are based on the premises outlined herein and are valid for the purpose stated.

## CERTIFICATION OF APPRAISAL

The undersigned does hereby certify that, except as otherwise noted in this appraisal report:

1.     I have no present or contemplated future interest in the real estate that is the subject of this appraisal.

2.     I have no personal interest or bias with respect to the subject matter of this appraisal report or the parties involved. The appraisal has not been based on a requested minimum valuation, specific valuation or the approval of a loan.

3.     My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

4.     To the best of my knowledge and belief, the statement of facts contained in this appraisal report, upon which the analysis, opinions, and conclusions expressed herein are based, are true and correct.

5.     This appraisal report sets forth all of the limiting conditions (imposed by the terms of my assignment or by the undersigned) affecting the analysis, opinions, and conclusions contained in this report.

6.     Our analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Code of Professional Ethics and Standards of Professional Conduct of the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation and the Appraisal Institute.

7.     Guido M. Villanueva inspected the subject property.

8.     No one other than the undersigned prepared the analysis, conclusions, and opinions concerning real estate that are set forth in this appraisal report.

| Guido M. Villanueva                         |   |
| Certified-General Appraiser # AG010546      |   |
| Expires: February 21, 2010                  |   |